Rocco CALDAROLA, Joseph Freeman, and James Santerello Plaintiffs,

v.

THE COUNTY OF WESTCHESTER, Andrew J. Spano, in his capacity as County Executive of the County of Westchester, and Rocco A. Pozzi, in his capacity as the Commissioner of the Westchester County Department of Correction, Defendants.

No. 99 CIV. 8700(CM).

United States District Court, S.D. New York.

March 16, 2001.

Robert David Goodstein, Goodstein & West, New Rochelle, NY, for plaintiffs.

Matthew T. Miklave, Epstein, Becker & Green, P.C., New York City, Lori Ann Alesio, County Attorney, White Plains, NY, for defendants.

## MEMORANDUM AND ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

McMAHON, District Judge.

Plaintiffs Rocco Caldarola, Joseph Freeman and James Santerello, current and former corrections officers (COs) with the

Westchester County Department of Correction (DOC), bring this action against Westchester County, and against Westchester County Executive Andrew J. Spano and Westchester County Department of Correction Commissioner Rocco A. Pozzi in their official capacities,[1] under 42 U.S.C. § 1983, for alleged violations of plaintiffs' rights under the Fourth Amendment of the United States Constitution.

Plaintiffs claim that the County "staged" plaintiffs' arrests, and that a County employee filmed plaintiffs as they were escorted out of the DOC building into waiting cars. Plaintiffs claim that the DOC then showed this footage at a press conference the afternoon of the arrests, disseminated copies of the footage to the media, and notified the press that plaintiffs would be traveling to the courthouse for their arraignment, all in violation of plaintiffs' right to be free from unreasonable searches and seizures under the Fourth Amendment of the United States Constitution. In advancing this claim, plaintiffs rely on the recent case of *Lauro v. Charles*, 219 F.3d 202 (2d Cir.2000), in which the Second Circuit upheld District Court Judge Allen G. Schwartz's decision that a staged "perp walk," during which an arrestee is brought outside, put in a car, driven around the building, removed from the car, and walked back inside the building, solely for the purpose of allowing the media to film the accused, is unconstitutional. *Id.*

For the reasons discussed below, defendants' motion for summary judgment is granted.

## FACTUAL BACKGROUND

While plaintiffs have attempted to convince the court otherwise, most of the material facts of this case are not in dispute.

Pursuant to New York General Municipal law § 207–c and a collective bargaining agreement between plaintiffs' union, the Westchester County Correction Officers Benevolent Association ("COBA") and the County, Westchester County COs who are injured on the job may collect their full salary and benefits while they are on leave. Under this agreement, the DOC bears the burden of proving the CO is able to return to work. In 1998, the DOC began an investigation to determine whether COs who were on injured-leave were filing false job injury claims. As part of this investigation the DOC conducted surveillance of selected COs on injured-leave, including videotaping the officers in their daily activities. DOC determined that four of these COs, including Freeman and Santerello, did not have legitimate claims, and a fifth, Caldarola, was not living in New York State, in violation of laws that required him to do so.

Commissioner Pozzi planned to arrest plaintiffs and two other COs on July 12, 1999. In preparation for this, Pozzi advised his Special Assistant, Anthony Czarnecki, that Czarnecki should arrange for security clearance to allow a County employee to come onto DOC property and to videotape the transport of the plaintiffs from the rear of the DOC headquarters building to the Department of Public Safety (the name given to the County's police department).

On July 9, 1999, Susan Tolchin, Director of Communications for Westchester County, issued a press advisory, which stated in part:

> Westchester County Executive Andy Spano will make a major announcement

1. On September 1, 2000, the parties agreed to the withdrawal of all claims against Spano and Pozzi in their individual capacities.

at a press conference on Monday, July 12, 1999 at 2 p.m. in Room 938 of the Michaelian Office Building.

(Sorry folks, this is all we are revealing at this time, but trust me—it's a good story.)

**PHOTO AND VIDEO OPPORTUNITY**

(Alesio Aff. at Ex. K.)

On or about Friday, July 9, 1999, Sergeant Glenn Solataroff called plaintiffs and directed each of them to report to DOC headquarters on Monday, July 12.[2] Felony complaints were issued on July 12 against the plaintiffs, charging them with Grand Larceny in the Third Degree, a class D Felony.[3]

When Caldarola and Santerello arrived at the DOC sometime between 9:00 and 9:35 a.m., plaintiffs claim that they were escorted into a conference room, and that COBA Executive Secretary Scott Driesen, who arrived at the DOC to aid plaintiffs, was asked to leave the building. Caldarola and Santerello allege that they were prevented from stepping outside the building to smoke a cigarette, and that shortly thereafter they were each taken into separate rooms, placed under arrest by officers from the Department of Public Safety, and handcuffed. While it is not clear from the record when Freeman arrived at the DOC,

he claims that he was also escorted to a conference room, where he waited for approximately one hour before being arrested. A fourth CO, Arthur Smith, was also arrested that morning.[4]

Plaintiffs claim that after being placed under arrest and handcuffed, the Department of Public Safety officers "handed" plaintiffs back over to officers from the Special Investigations Unit (SIU) of the DOC, who transported them to the police station.[5]

There is no dispute that a Westchester County employee, positioned outside the DOC building but still on DOC private property, videotaped plaintiffs as they exited the rear of the headquarters building, one-by-one, and were placed into cars. The County employee had permission to be on the grounds, which are closed to the press.

The County held a press conference at approximately 2 p.m. on July 12, during which Spano announced the arrests. Spano played a videotape "montage" for the press, in which video of some of the arrestees from that morning was followed by portions of surveillance tape that allegedly supported the charges against the CO. As the tape ran, Spano named the COs and described the injury for which they were

---

**2.** There is some evidence in the record that one or more of these calls may have been made on the morning of Monday, July 12.

**3.** In their papers, plaintiffs also complain that their arrests were not lawful, and that they were denied access to counsel or union representation at the time of arrest. However, Plaintiffs do not raise a denial of counsel claim in their complaint, nor do they allege a violation of the Fourth Amendment based on lack of probable cause. In fact, Caldarola has brought a separate action before this court alleging that the County lacked probable cause to arrest him. *See Caldarola v. De-*

*Ciuceis*, 142 F.Supp.2d 444(S.D.N.Y.2001). The only issue presently before this court is plaintiffs' "perp walk" claim. To the extent plaintiffs are arguing that the denial of representation and the lack of access to the union representative contributed to the unreasonableness of the "seizure," I do not find this conduct to be relevant.

**4.** Smith, who was previously a plaintiff in this action, withdrew his claims on June 19, 2000.

**5.** They also claim that later in the day, SIU officers, not County police officers, took them in DOC cars from the police station to the courthouse for arraignment.

listed as being on leave. He spoke first about plaintiff Freeman:

> This is Joseph Freeman. He began with the Department in 1986. *This is him being arrested this morning.* He has a long history of injury absences. This time the doctor said he was not able to push a button with his right hand. He's supposed to be out until August. Now take a look at some of this. Now you see him at Home Depot. He's buying some track lighting. You see the date and the time. He takes it home and watch his right hand. There you can see it very clearly. This is the right hand that he was unable to push a button with. Full pay, tax free.

(Kelly Aff. at Ex. 16 (Press Conference Video); Ex. 11 at 2–3 ("Transcript").) (emphasis added)

After showing footage of Smith and another CO (not plaintiffs to this action), Spano stated that "We don't have the fourth one to show you today," referring to plaintiff Santerello, who Spano said was claiming to have "a bum right hand." Instead, Spano held up what he said were Santerello's bowling scores, stating, "He's a right-handed bowler." Spano and another individual standing off-camera informed the press that Santerello bowled a "280 game . . . the day of his injury." He said the County did not have any surveillance tape of Santerello—that instead they had witnesses who had seen him bowling. (Transcript at 3–4.)

When asked why these particular correction officers were chosen, Spano said:

> Largely we focused on a number of individuals, okay? We have about 93 to pick from. Is that correct? And that has been brought down from 120 when we first started. But we want to make it clear that it's a delicate balance we're trying to achieve. We certainly want all our officers who are legitimately injured to be able to go out on 207–c and get their money so that their families can live and everything else goes on. But we are really sending a message with this to those individuals who are abusing the system and, you know, causing all kinds of problems, not only for the County and the taxpayers here, but also their fellow workers.

(Transcript at 4.) Spano was also asked why the County had this problem. Spano mentioned New York General Municipal Law 207–c and the fact that the County's contract with the union "stipulates that the County and the Union must agree on the hearing officers." He continued, "Well, for a long time we couldn't get them to agree on more hearing officers, so the number of hearings that we could have in a particular month was very few considering the people who were out." (Id. at 5.)

Spano then introduced Commissioner Pozzi, who made comments and answered questions. Following this, Pozzi introduced an individual identified in the videotape of the press conference as "Commissioner D'Aliso," Commissioner of Public Safety. D'Aliso noted that "after the arrests these people were transported to the Westchester County police headquarters, processed, and they're pending arraignment right now in the Town of Mt. Pleasant Court."

Plaintiffs also allege that the County provided footage from the press conference tape to the media, and that it was shown that night on area news programs.

Upon their arrival outside the Mr. Pleasant Courthouse, plaintiffs allege that Freeman and Santerello were made to wait in their vehicle for ten to fifteen minutes while the second car carrying Caldarola and Smith, pulled up. They allege that this allowed the media present outside the courthouse to film plaintiffs before

they were removed from the vehicle and brought inside. According to plaintiffs, the SIU drivers spoke to each other over "microphones," instructing each other to get into position, stop at a particular place, and wait until everyone was ready. When the second car carrying Caldarola and Smith did arrive, plaintiffs allege that the SIU officers exited the car and allowed the media to film plaintiffs for "several minutes" while they sat in the car. Plaintiffs also claim they were filmed and questioned by the media as they walked up the steps of the courthouse.

## CONCLUSIONS OF LAW

Plaintiffs' Fourth Amendment claims appear to be based on three different "sets" of actions by County officials. First, plaintiffs complain of the County's decision to allow a County employee onto the grounds of the DOC headquarters for the purpose of filming each individual plaintiff as he was escorted from the building, and the efforts by County officials to coordinate the arrests with the police and to time plaintiffs' transport so that the video could be made. Second, plaintiffs complain that the County's use of the video footage filmed by the County employee in the press conference, and the dissemination of that video was also done in violation of plaintiffs' Fourth Amendment rights. Finally, they point to the circumstances of plaintiffs' walk into the courthouse for their arraignment, claiming that the advisory to the press about the arraignment and coordinating the plaintiffs' arrival at the courthouse was a separate violation under the Fourth Amendment.

Each of these events, plaintiffs argue, was a variation on a "perp walk" that amounted to a seizure of plaintiffs, one that intruded upon their privacy interests and personal rights, and was conducted in a manner designed to cause humiliation to plaintiffs without any legitimate law enforcement objective or justification. Plaintiffs' § 1983 action thus rests on the claim that defendants deprived them of rights secured to them by the Fourth and Fourteenth Amendments to be free from unreasonable searches and seizures and to be accorded due process of law. *See Rizzo v. Goode*, 423 U.S. 362, 370–71, 96 S.Ct. 598, 46 L.Ed.2d 561 (1976) (holding that § 1983 imposes liability "for conduct which subject, or causes to be subjected the complainant to a deprivation of a right secured by the Constitution and laws"). Defendants argue that none of their actions amounted to a "seizure" of plaintiffs under the Fourth Amendment. Alternatively, they argue that the videotape and press conference served a legitimate law enforcement purpose.

1. Standard

■ The Fourth Amendment prohibits "unreasonable searches and seizures." U.S. Const. Amend. IV. Notwithstanding language in some cases, the Supreme Court has made clear that the rights protected by the Fourth Amendment are affected differently, depending on whether the challenged conduct constitutes a search or a seizure. *Horton v. California*, 496 U.S. 128, 133, 110 S.Ct. 2301, 2306, 110 L.Ed.2d 112 (1990) ("A search compromises the individual interest in privacy; a seizure deprives the individual of dominion over his or her person."). To find a violation of the Fourth Amendment, the County's actions must have amounted to a search or a seizure, and the search or seizure must have been unreasonable. *Ayeni v. Mottola*, 35 F.3d 680, 684 (The Fourth Amendment's proscription of unreasonable searches and seizures "not only...prevent[s] searches and seizures that would be unreasonable if conducted at all, but also...ensure[s] reasonableness in the manner and scope of searches and

seizures that are carried out."), *cert. denied* 514 U.S. 1062, 115 S.Ct. 1689, 131 L.Ed.2d 554 (1995). A Fourth Amendment examination "requires a contextualized reasonableness analysis that seeks to balance the intrusion on privacy caused by law enforcement against the justification asserted for it by the state." *Lauro v. City of New York*, 219 F.3d 202 (2d Cir. 2000); *Graham v. Connor*, 490 U.S. 386, 396, 109 S.Ct. 1865, 1871, 104 L.Ed.2d 443 (1989).

In *Lauro,* the Second Circuit addressed the constitutionality, under the Fourth Amendment, of staged "perp walks," in which an arrestee is paraded in front of the press to allow for filming. As the holding in *Lauro* was based on a very specific set of facts, in which plaintiff was subjected to a particular type of "perp walk," I will relate those facts in some detail.

John Lauro was arrested on September 18, 1995 and charged with, among other crimes, burglary in the second degree. *Lauro,* 219 F.3d at 204. Some hours later, while plaintiff was still in the precinct, the arresting detective received a call from the department's Deputy Commissioner of Public Information, who told the detective that the media was interested in plaintiff's case, and that plaintiff should be taken on a "perp walk." *Id.* Pursuant to this request, Lauro was handcuffed, walked by the detective down the stairs, out the front door, and outside of the building. He was placed in an unmarked car, driven around the block, and walked back into the precinct. During the "walk," Lauro was filed by a television news crew, and the footage, along with surveillance footage of Lauro's alleged crimes, was shown on the evening news. *Id.* at 204–05. Lauro brought a § 1983 claim for violations of the Fourth and Fourteenth Amendments, the Due Process Clause of the Fourteenth Amendment, and the Eighth and Fourteenth Amendments to the Constitution, as well as numerous violations of New York state law. *Id.* at 205.

The Court found that Fourth Amendment protections apply to persons already in police custody, and that those protections were implicated by "police conduct that unreasonably aggravates the intrusion on privacy properly occasioned by the initial seizure." *Id.* at 212. The Second Circuit approached the Fourth Amendment analysis with two questions: (1) did the perp walk intrude upon interests protected by the Fourth Amendment, and (2) if it did, was it nevertheless reasonable in light of legitimate law enforcement purposes? *Id.* Noting that Lauro's perp walk could be viewed as either a separate, unreasonable seizure that occurred when plaintiff was forcibly removed form the station and brought back in, or an unreasonable continuation and aggravation of the seizure that occurred when plaintiff was arrested, the Second Circuit agreed with the district court that under either analysis, the result was the same—Lauro's Fourth Amendment interests were implicated. *Id.*

The Court then held that "the perp walk might nevertheless have been reasonable under the Fourth Amendment, had it been sufficiently closely related to a legitimate governmental objective." *Id.* Even assuming the state has a legitimate interest in accurate reporting of police activity, the Lauro Court held that such an interest was not served "by an inherently fictional dramatization of an event that transpired hours earlier." *Id.* at 213. Because the staged perp walk "was unrelated to the object of the arrest, ... had no legitimate law enforcement justification, and ... invaded Lauro's privacy to no purpose," it exacerbated Lauro's seizure in an unreasonable manner in violation of the Fourth Amendment. *Id.*

As the case at bar differs significantly from *Lauro*, it is important to delineate not only what *Lauro* held, but what it did *not* hold. To this end, the Second Circuit explicitly stated that:

> [W]e do not hold that all, or even most, perp walks are violations of the Fourth Amendment. Thus, *we are not talking about cases in which there is a legitimate law enforcement justification for transporting a suspect.* Accordingly, we do not address the case-seemingly much more common than the kind of staged perp walk that occurred here-where a suspect is photographed in the normal course of being moved from one place to another by the police. *Nor do we reach the question of whether, in those circumstances, it would be proper for the police to notify the media ahead of time that a suspect is to be transported.*

*Id.* (emphasis added). The case at bar implicates both of the scenarios that were not addressed in *Lauro*.

I conclude that *Lauro* should be limited to its facts, and should not be expanded to cover the conduct complained of by plaintiffs.

2. The Videotaping Of Plaintiffs As They Left The Department Of Corrections Building Was Not Unconstitutional

Defendants are correct that the decision by County officials to coordinate plaintiffs' arrest and their exit from the building, and to film this event, does not implicate plaintiffs' Fourth Amendment rights.

a. The Act of Filming Plaintiffs Was Not A Seizure

■ Plaintiffs first rely on an alternative holding made by the district court judge in *Lauro* (and not addressed by the Second Circuit) to the effect that the videotaping of Lauro itself constituted a seizure of "intangibles," such as plaintiffs' images. *Lauro,* 39 F.Supp.2d 351, 363–64 (S.D.N.Y.1999). I cannot agree that the act of filming the plaintiffs constituted any sort of a seizure whatsoever for Fourth Amendment purposes.

■ The Supreme Court has stated that "wherever an individual may harbor a reasonable 'expectation of privacy,' he is entitled to be free from unreasonable governmental intrusion." *Terry v. Ohio,* 392 U.S. 1, 9, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968) (citations omitted). However, as the Supreme Court has also made clear, a "seizure" contemplates a physical intrusion on a possessory interest of some kind, whether an interest in the possession of an object or in oneself. *See Horton v. California,* 496 U.S. 128, 133–34, 110 S.Ct. 2301, 110 L.Ed.2d 112 (1990); *see also U.S. v. Jacobsen,* 466 U.S. 109, 113, 104 S.Ct. 1652, 80 L.Ed.2d 85 (1984) (holding that seizure occurs when there is "some meaningful interference with an individual's possessory interests.")

Plaintiffs argue that, because they were escorted to the waiting police cars on DOC private property, they had an expectation of privacy within the meaning of *Katz v. United States,* 389 U.S. 347, 360, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967) (Harlan, J., concurring) (explaining that plaintiff must have exhibited an actual (subjective) expectation of privacy and that the expectation must be one that society is prepared to recognize as reasonable), and that the taping was a seizure because it was an intrusion on this privacy. To the extent this argument rests on the fact that the videotape was later shown to the press, it is addressed in the next section of this opinion. To the extent that plaintiffs argue about the very fact of the videotaping, they are simply wrong.

It is critical to address the act of making the videotape separately from, as well as

together with, the subsequent showing of the videotape, since two of the three defendants (Caldarola and Santerello) do not appear in the videotape that was shown to the press. Thus, if those defendants have any claim at all, it must be that they had a constitutional right not to be videotaped—period. For many reasons, this argument is absurd.

I first quarrel with the notion that—at least in the circumstances at bar—something was "seized" when plaintiffs were videotaped. Obviously, there was no physical seizure—twenty-first century Americans do not subscribe to the view that a person's spirit or essence is "captured" or "stolen" by a camera. The cameraman did not unreasonably intrude on plaintiffs' "space." He was not inside the building during the arrests, nor did he film the arrests. He did not approach plaintiffs unnecessarily while he was filming, and he did not talk to plaintiffs.

Nor was there any physical intrusion that interfered with any possessory interest plaintiffs possessed. All the camera did in this instance was record certain facts: that plaintiffs were present at DOC Headquarters and that they were in custody when they left DOC Headquarters for some other location. The fact that a person can be found in a particular place at a particular time does not give rise to some possessory interest, and it would be unreasonable to conclude otherwise. In analogous circumstances, Justice Harlan noted, "Conversations in the open would not be protected against being overheard, for the expectation of privacy under the circumstances would be unreasonable." *Katz*, 389 U.S. at 361, 88 S.Ct. 507 (concurring) (citations omitted).

Plaintiffs have not identified any possessory interest they had in not being videotaped, and this Court can think of none. The *Lauro* district court's conclusion about the seizure of intangibles clearly rested on the proposition that creating a fictitious event for publicity purposes was an unreasonable, and therefore unlawful, seizure. *See Lauro*, 39 F.Supp.2d at 363–64 (holding that "voice and sound recordings of an individual are interests that are protected by the Fourth Amendment under current case law") (citing *Ayeni v. Mottola*, 35 F.3d 680 (2d Cir.1994) (finding filming of plaintiff's home and family during a search for documents by new crew, for no legitimate law enforcement purpose, rendered the search unreasonable)). With this proposition I have no quarrel. However, the videotaping was not the unlawful seizure—forcing Lauro to participate in the fictitious arrival drama was. *See Lauro*, 39 F.Supp.2d at 363; *see also Ayeni*, 35 F.3d at 688 (objecting to the fact that images and sounds of "the Ayenis themselves [were taken]" for no other reason except to televise them). The Court can, however, think of many reasons why the County might wish to videotape the transporting of plaintiffs. Indeed, in this day and age, when allegations of brutality and other improper conduct are alleged against law enforcement officials with great frequency, there is an element of self-protection in an agency's videotaping all facets of a law enforcement encounter.

Finally, I note that it has been common practice for police to take mug shots of newly-arrested defendants, and no court has ever suggested that this practice somehow intruded on the defendant's Fourth Amendment rights. The act of videotaping cannot be distinguished from the act of photographing in any principled way. Plaintiffs' were not "seized," unreasonably or otherwise, by virtue of being videotaped.

b. The Fact That The County "Choreographed" The Arrests Does Not Change The Holding

██ Plaintiffs also argue that defendants' conduct in "staging" the arrests in

such a manner so as to allow for the videotaping resulted in an unreasonable aggravation of their initial seizure, or arrest. Defendants contend that the videotaping did not affect the manner of plaintiffs' arrests or the procedure by which they were transported from the DOC to the Department of Safety.

I reject both sides' characterization of what occurred. Plaintiffs' arrests were not "staged" in the same manner that Lauro's "arrival" at the police station was "staged." Plaintiffs really were arrested at the time the videotape was made. Nothing that happened to plaintiffs was fictitious. However, there is no question that the arrest was "choreographed." Rather than arrest each plaintiff separately, defendants required them to show up at the same designated place and time. Plaintiffs were not told why they were reporting to DOC headquarters, apparently in an effort to ensure their appearance at DOC headquarters that morning. Freeman waited for some time before being arrested and led outside. This undoubtedly facilitated the County's efforts to obtain videotape.

Nevertheless, I do not find that defendants' actions were an "improper exacerbation of an otherwise lawful seizure." *Lauro*, 219 F.3d at 209. Unlike the perp walk in *Lauro*, which was a fictional recreation of plaintiff's arrest, the footage shot in this case was "reality television" (albeit with scripted stage directions). Plaintiffs were actually being transported for arrest processing, so what was filmed was legitimate law enforcement activity—not a wholly fictitious event. Moreover, while defendants may have waited to bring plaintiffs outside, plaintiffs were taken directly into the waiting cars and driven to the police station once they exited the DOC building. Their time before the camera was not prolonged beyond that which was necessary to walk from the building to the car.

I conclude that *Lauro* should be limited to wholly fictitious events like the unnecessary perp walk to which Lauro was subjected, and thus decline to extend its rationale to the facts at bar.

3. Defendants' Use Of The Videotape At The Press Conference Was Not Unconstitutional

■ While the making of videotape itself was not a seizure, plaintiffs (actually, plaintiff Freeman, since the other two plaintiffs do not appear on the publicly disseminated videotape) also argue that defendants' decision to show the arrest footage at the press conference, and to distribute it later to the press, violated their Fourth Amendment rights. This argument, while fallacious, is worthy of separate analysis.

Freeman does not directly argue that DOC's publication of the videotape violated some right to be free from injury to his reputation. Nonetheless, that is the thrust of his argument—that publishing his image to the press (which led to the further, uncontrollable dissemination of the image by the press), thereby injuring his reputation, converted the otherwise lawful internal filming of his walk from the place of arrest to the transport vehicle into a seizure. I cannot agree.

There are no Fourth Amendment cases directly on point. However, numerous cases have addressed the constitutionality of government interference with a person's reputation, albeit under the substantive right to privacy found generally in the Constitution and advanced under the Due Process Clause of the Fourteenth Amendment, rather than under the Fourth Amendment. *See Paul v. Davis,* 424 U.S. 693, 701, 96 S.Ct. 1155, 1160, 47 L.Ed.2d 405 (1976); *Rosenberg v. Martin,* 478 F.2d

520, 525 (2d Cir.1973); *Lauro*, 219 F.3d at 209; *see also Smith v. Coughlin*, 727 F.Supp. 834, 842–43 (S.D.N.Y.1989) (no protection against disclosure of an ongoing investigation). That line of cases—in each of which the plaintiff was subjected to highly detrimental publicity at then hands of law enforcement officers—holds that there is no constitutionally-protected interest in being free from reputational injury alone.

In *Paul*, defendants, a county and local police chief, jointly decided to distribute an "Active Shoplifters" flyer to merchants with pictures individuals who had been arrested of shoplifting. *Paul*, 424 U.S. at 695–96, 96 S.Ct. at 1158. Davis, who had been arrested for but not convicted of shoplifting some eighteen months earlier, sued pursuant to 42 U.S.C. § 1983, arguing that the flyer, and particularly the phrase "Active Shoplifters" appearing at the head of the page on which his name and photo appeared, irreparably deprived him of some "liberty" protected by the Fourteenth Amendment. The Supreme Court rejected "the proposition that reputation alone, apart from some more tangible interests such as employment, is either 'liberty' or 'property' by itself sufficient to invoke the procedural protection of the Due Process Clause." *Paul*, 424 U.S. at 701, 96 S.Ct. at 1161.

The Second Circuit addressed the question of reputational injury—albeit in the context of an only "recently evolved" right to privacy—in *Rosenberg v. Martin*, 478 F.2d 520, 525 (2d Cir.1973), a case strikingly similar to the one at bar. Rosenberg was suspected of killing two police officers during an armed robbery, and the case had garnered intense media attention. He eventually turned himself in at the offices of the New York Daily News, the day after that paper published a story about the murders and the investigation which implicated Rosenberg. Martin, the arresting officer (and an alleged source of the Daily News story) brought Rosenberg to the station house in Brooklyn, where the plaintiff testified that:

> he ...was taken out of the police car a half block away from the station, where television cameras and newsmen were lined up on the street; that, as he was dragged toward the cameras, Martin said "He is the killer, and he is going to burn"; and that he later saw video tapes of the scene, of Martin's remark, and of the crowd's angry response. Photographs of the booking of the three men, published in unidentified newspapers, were also received in evidence.

*Rosenberg*, 478 F.2d at 523. Rosenberg's situation, like the case at bar, was the one that the Second Circuit was "not talking about" in *Lauro*—where the unflattering press coverage came in the context of legitimate, as opposed to wholly fictitious, law enforcement activity.

The Second Circuit held that Martin's behavior did not amount to a violation of Rosenberg's constitutional rights. As to Rosenberg's claim that "the publicity preceding his arrest, the televised recording, and the publication of photographs" invoked the constitutionally protected right to privacy, the Court found that "little need be said:"

> "Exposure of the self to others in varying degrees is a concomitant of life in a civilized community. The risk of this exposure is an essential incident of life in a society which places a primary value of freedom of speech and of press." It is indisputable that the interest in privacy of a fugitive suspected of serious crime must yield to the public interest in his apprehension and the consequent publication of whatever may reasonably be deemed helpful to that end.

*Id.* at 524 (quoting *Time, Inc. v. Hill,* 385 U.S. 374, 388, 87 S.Ct. 534, 542, 17 L.Ed.2d 456 (1967)). While the Court did not claim that "no conduct of police officers toward a suspected criminal, even a murderer, may ever constitute a violation of a constitutional right to privacy," it refused to find that the police conduct in *Rosenberg* stated a cause of action under § 1983.

 Reasoning from *Paul* and *Rosenberg* and similar cases implicating the Fourteenth Amendment, I fail to see how publicizing the internal videotape—which it was not inherently illegal to make—converted the filming into a violation of Freeman's Fourth Amendment rights. It is true, as the *Lauro* court noted, that actions that are valid under the Fourteenth Amendment may nonetheless be invalid under the Fourth Amendment. *Lauro,* 219 F.3d at 209. But is it equally true, contrary to Freeman's contention, that "The Fourth Amendment cannot be translated into a general constitutional 'right to privacy.'" *Katz v. United States,* 389 U.S. 347, 350, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967). Indeed, the *Paul* Supreme Court held that dissemination of the "Active Shoplifters" flyer did not implicate plaintiff's Fourth Amendment rights. Davis complained that the passing out of the flyer violated his "right to privacy guaranteed by the First, Fourth, Fifth, Ninth and Fourteenth Amendments." [6] *Paul,* 424 U.S. at 712, 96 S.Ct. at 1166. The Court found that the case came within none of the "zones of privacy" that "may be created by more specific constitutional guarantees and thereby impose limits upon governmental power." *Id.* at 713, 96 S.Ct. at 1166. Specifically, defendants' conduct did not implicate the Fourth Amendment, be-

cause plaintiff "[did] not seek to suppress evidence seized in the course of an unreasonable search." *Id.* Similarly, Freeman cannot claim that information or images used by defendants were obtained during an unreasonable search or seizure, because, as I have already held, the mere act of videotaping was not an unreasonable seizure. Therefore, the use of the tape implicates no analytically distinct right of privacy under the Fourth Amendment.

Thus, it is quite clear that the Fourth Amendment "protects individual privacy only against *certain kinds* of governmental intrusion." *Id.* (emphasis added). The question is whether the scenario posited by Freeman constituted a "certain kind" of intrusion—as was the case in *Lauro*—or whether it is sufficiently different from *Lauro* so as not to fall within that decision's ambit.

Once again, I conclude that *Lauro* should be limited to its facts and should not be applied to this utterly different situation. The Fourth Amendment right to privacy was clearly implicated by the defendants' conduct in *Lauro.* There, the defendant, already safely in the police station for arrest processing, was literally picked up, taken outside a building he had already entered, and forcibly paraded in front of prying eyes and cameras. No such thing happened here. In reality, nothing happened to Freeman that has not happened to thousands of criminal defendants subsequent to their arrests, when their mug shots are shown at press conferences and/or released to the press. As far as I am aware, no one has ever suggested that giving a mug shot to the local newspa-

---

6. The Court of Appeals, because it found a sufficient Due Process violation and remanded the case to the District Court, did not address this claim. Because the Supreme Court agreed with the District Court on the Due Process issue, it had to consider whether any other Constitutional provision could support the litigation. *Paul,* 424 U.S. at 712, 96 S.Ct. at 1166.

per or television station transforms the taking of that photograph into a seizure.

The only thing that might give pause in reaching this conclusion is the fact (asserted by Freeman and not refuted by defendants) that the press are not permitted on DOC's premises. He argues from this that it violated his rights for a DOC employee to make videotape that would be available to the press, because he had a reasonable expectation that the press would not be able to watch his arrest and, hence, could not show it on television. However, the same argument could be made about the publication of mug shots, which are ordinarily taken in limited access areas of police stations. Indeed, this line of argument simply underscores that what plaintiff is concerned about is the perceived injury to his reputation, not redress for being unlawfully seized.

■ Finally, this Court is willing to conclude what the Second Circuit declined to reach in *Lauro:* the State does have a legitimate interest in the accurate reporting of police activity, and to that end is free to advise the press about events related to a suspect's arrest, processing and arraignment, including events that by their nature will rise to "photo opportunities" and Kodak moments.

I therefore decline Freeman's invitation to bootstrap the making of a videotape onto otherwise legitimate arrest-related activity and thereby to create out of whole cloth an enforceable right under the Fourth Amendment where there is none under the Fourteenth.

4. The Press Advisory And The Courthouse "Perp Walk" Were Not Unconstitutional.

■ The circumstances of plaintiffs' travel from the precinct to the courthouse, where members of the press were waiting to film and question plaintiffs, do not constitute an unreasonable seizure. There is nothing unconstitutional about advising the press that defendants will be arraigned at a particular time and place. And there is nothing unconstitutional about having press present—even by arrangement—when a defendant is legitimately taken to court, as occurred here. The fatal error in *Lauro,* as I read the decision, was that the entire event was fictitious and served no other purpose except to provide a film crew with the opportunity to obtain footage for the evening news. The *Lauro* Court at least hinted, if it did not make clear, that it would not deem a warning or notification to the press to be unconstitutional. *Lauro,* 219 F.3d at 213. Indeed, to find such conduct unconstitutional, I would have to conclude that plaintiffs had a constitutional right to keep their identities and the fact of their arrests a secret, a conclusion I am required to reject in view of the Supreme Court's reasoning in *Paul,* 424 U.S. at 712, 96 S.Ct. at 1166, and the Second Circuit's conclusion in *Rosenberg,* 478 F.2d at 524–25.

■ Even if the courthouse "perp walk" could be considered a seizure for purposes of the Fourth Amendment, it did not violate plaintiffs' constitutional rights, because there was a legitimate law-enforcement reason for leaving the police station and bringing plaintiffs into the Mr. Pleasant courthouse—namely, their arraignment. Assuming, *arguendo,* that what the police were doing outside the courthouse was waiting for the press to arrive, I am not persuaded that this action unconstitutionally aggravated the legitimate seizure that occurred when plaintiffs were arrested. The fact is, plaintiffs' arrest was a newsworthy event. The press could not be kept from covering it, and the police are not constitutionally compelled to make their job more difficult.

## CONCLUSION

For the reasons discussed above, defendants' motion for summary judgment is granted. The clerk is directed to dismiss all claims against defendants and to close the case.

This constitutes the order and decision of the Court.