**Rocco CALDAROLA Plaintiff,**

v.

**William DeCIUCEIS, individually, Christopher Calabrese, individually, and the County of Westchester Defendants.**

No. 00 CIV. 2944(CM).

United States District Court, S.D. New York.

March 27, 2001.

Jonathan Lovett, Lovett & Gould, White Plains, NY.

Matthew Miklave, Epstein Becker & Green, New York City.

MEMORANDUM DECISION AND OR-
DER DENYING IN PART AND
GRANTING IN PART DEFEN-
DANTS' MOTION FOR SUMMARY
JUDGMENT AND DENYING IN
PART AND GRANTING IN PART
PLAINTIFF'S MOTION TO
AMEND THE COMPLAINT

McMAHON, District Judge.

Plaintiff, a corrections officer (CO) with the Westchester County Department of Correction (DOC), brings this action under 42 U.S.C. § 1983, for malicious prosecution and false arrest in violation of his rights under the Fourth Amendment to the United States Constitution.[1] Defendants move for summary judgment, claiming probable cause as a defense to plaintiff's claims. Plaintiff also moves for leave to serve and file an amended complaint adding additional defendants, adding certain claims, and dismissing William DeCiecius as a defendant.

---

**1.** Plaintiff voluntarily withdrew his Due Process, Equal Protection, and First Amendment claims on May 22, 2001. (Pl. Mem. in Partial Opp'n. to Def.'s Mot. to Dismiss.)

For the following reasons, defendants' motion for summary judgment is granted with respect to the malicious prosecution claim, and denied with respect to the false arrest claim. Plaintiff's motion for leave to amend the complaint is denied, except to the extent of adding Louis D'Aliso as a party defendant.

## FACTUAL BACKGROUND

Under Section 207–c of the New York State General Municipal Law, corrections officers injured in the line of duty are entitled to certain medical and salary continuation benefits, including, inter alia, continuation of their salary while recovering from job-related injuries. These "job injury benefits" are not subject to federal, state and local income taxes. Section 207–c and certain provisions of the New York State Workers' Compensation Law are combined in an "Appendix B" of an collective bargaining agreement between the DOC and the Correction Officers Benevolent Association ("COBA"), the organization that represents all COs employed by the DOC. Though the contract has expired, the terms of the agreement remain in effect pursuant to New York law. Under Appendix B, COs claiming a job injury are entitled to immediate compensation pending a hearing to determine whether the CO was, in fact, injured in the line of duty.

In response to reports of abuse of these provisions by COs who were falsely claiming job injury benefits, Commissioner of Corrections Rocco Pozzi proposed that the County undertake limited surveillance of some of its COs to determine whether the County could identify any illegitimate claims. Pozzi asked the DOC's Attendance Management Unit ("AMU") for a list of eighteen to twenty individuals receiving 207–c benefits whom the DOC suspected may not have been injured or who may have been exaggerating his or her injury.

Plaintiff was included on this list because he had been out due to a purported job injury to his thumb for more than one year, and the DOC had heard rumors that he was nevertheless operating a landscaping business while on job injury. County Executive Andrew Spano authorized that the surveillance be conducted by private investigation firms (rather than by DOC) in order to keep the investigation confidential.

Surveillance of plaintiff soon revealed that Caldarola may not have been living at the address he listed as his New York State residence. Section 30 of the Public Officers Law states that a CO may not lawfully receive injury benefits under 207–c of the General Municipal Law unless he remains a New York resident. Copstat Security Inc. ("Copstat"), one of the investigation firms hired by the County, prepared an April 15, 1999 report detailing the results of their investigation and surveillance of Caldarola.

Copstat reported that the address it had initially received for Caldarola, 30 Jefferson Avenue, White Plains, NY, was at one time the residence of Caldarola's parents. According to neighbors interviewed by the Copstat investigator, they had recently moved. One neighbor who would not give her name thought that the Caldarolas had moved to Florida, and a Hispanic family had purchased the home. Another neighbor, Mr. Shem Guilbory of 22 Jefferson Avenue, confirmed that the Caldarolas had moved out, and said that the house had been sold to an "Hispanic family" whom he did not know. Guilbory refered the investigator to another neighbor, Mr. Valente of 15 Jefferson Avenue, whom Guilbory identified as a "friend" of Mr. Caldarola Sr.

The investigator later spoke by phone with Mr. Valente, who told the investigator that Caldarola Sr. had sold his home about "three months ago and went to live with

his son in Connecticut," but that he did not know where because he had not heard from Caldarola since he had moved. Finally, the investigator spoke with another unidentified neighbor at 37 Jefferson Avenue, who said the house was sold about five months earlier, and that the Caldarolas moved upstate, though he had no idea where.

On March 22, the investigator checked postal records at the White Plains Post Office on 100 Fisher Avenue, which revealed that Rocco Caldarola had not received mail at the 30 Jefferson Avenue address for over one year, that Mrs. Stella Caldarola had her mail forwarded to PO Box 5251 Orchard Beach, Florida 32175, and that there was no forwarding address for either Caldarola Senior or Junior.

When the investigator returned to Jefferson Avenue, he spoke with an occupant of 30 Jefferson Avenue, who refused to give her name, but confirmed that her husband owned the home, and that they had purchased the house from the Caldarolas in May 1998.

A DMV records check revealed a second address at 197 Pinewood Road in Hartsdale, NY. On April 7, the investigator visited the Hartsdale Branch of the U.S. Post Office.[2] The investigator's stated purpose was "to obtain the name of residents at 197 Pine Wood Road, Hartsdale, NY." The regular mail carrier for that address was out, and the relief carrier did not know the names of the residents at the Pinewood Road address.

On that same day, the investigator went to the vicinity of 197 Pine Wood Road. He spoke with a man who was in the driveway of the home next door, 195 Pine Wood Road, who identified himself as Mr. Dors-

back. Dorsback stated that he had lived at 195 Pine Wood for approximately 35 years, and that he was the head of the block association. When asked if he knew Rocco Caldarola, he stated that he had never heard of him and that no one by that name lived in the area. He told the investigator that a Figura family occupied 197 Pine Wood and had done so for approximately 13 years. No one by the name of Caldarola ever lived there. When the investigator explained that he was trying to locate a correction officer by that last name, Dorsback stated that Figura's daughter had married a correction officer a number of years ago. Dorsback was shown a photo of Caldarola, and said he was "about" one hundred percent sure it was the man who married the Figura daughter.

Plaintiff does not dispute that he is the owner of a home located at 8 Paradise Court in New Fairfield, CT, and the deed for the house, mortgage documents, and public health code documents obtained from public records confirm that he owns that property. Plaintiff claims, however, that while his estranged wife and children were living at that address during the relevant period, he was not using the Connecticut home as his primary residence.

As part of their decision to arrest Caldarola, defendants relied on a clause in his mortgage agreement, which states:

> Borrower shall occupy, establish, and use the Property as Borrower's principal residence within sixty days after the execution of this Security Instrument and shall continue to occupy the Property as Borrower's principal residence for at least one year after the date of occupancy, unless Lender otherwise agrees in writing, which consent shall not be un-

**2.** The report noted, most likely in error, that this post office branch "services 30 Jefferson Avenue."

reasonably withheld, or unless extenuating circumstances exist which are beyond Borrower's control.

(Mikalve Aff. at Ex. G.) Defendants did not contact the mortgage lender to ascertain whether plaintiff had obtained a written waiver from the principal residence requirement.

Between March 1, 1999 and April 13, 1999 Copstat investigators observed Caldarola leaving 8 Paradise Court between 8 AM and 8:30 AM on three different occasions. On March 1, a man fitting Caldarola's description left the property in a white minivan with a number of children passengers.[3] He drove to a gas station, where he purchased coffee and a newspaper, and then drove to two different schools to drop off the children in the car. Due to traffic, the investigator did not witness the van's return to Paradise Court. On March 8, the same subject drove the same minivan to the two schools, and stopped at the same gas station on his way back to Paradise Court. Almost one month later, on April 6, the investigator again observed Caldarola drive from Paradise Court, stop at the deli, drop off children at the two schools, and return to Paradise Court. On this third occasion a neighbor waved to plaintiff and indicated towards the investigator's car.

Plaintiff contends the Copstat report does not contradict the fact that at all times, he was a resident of New York State. He claims that he was registered to vote in New York, that his car was registered in New York, that his W-2s were sent to his New York "residence," and that he had a New York driver's license.[4] He also points to his local phone bills, copies of which show billing to a Rocco Caldarola at a third New York address, 1 Rose Lane in Brewster, NY, from 1996 through 2000, and one bill to a Rocco Caldarola at 197 Pinewood for October 19, 1999 through November 18, 1999.

Furthermore, Caldarola claims he notified the DOC on May 29, 1998, that he would remain with his family at their residence in Connecticut "as much as possible" due to an incident on or about that date where he was allegedly threatened with a gun by a DOC investigator. Following

---

**3.** The Court notes that the Copstat report appears to contain an incorrect date on the portion of the report describing the investigator's surveillance activities in more detail. The first date of surveillance listed is "May 1, 1999." However, subsequent dates are all in March and April, and the date on the report, April 15, 1999, also supports the conclusion that all the surveillance was done in those months. The discrepancy is of no moment.

**4.** In yet another of his many tiresome efforts to mischaracterize the record before this Court, plaintiff's counsel argues that defendant Calabrese, the Westchester County police officer who reviewed the Copstat report, did not check Caldarola's voter registration records in spite of a suggestion that he do so from Commissioner Pozzi. In support of this, he cites only to a November 5, 1999 fax, sent long after Caldarola's arrest, from Rocco Pozzi to Westchester County Attorney Lori Alesio (not to Calabrese or any DOC official). Pozzi's handwritten note on the fax cover sheet refers to a November 5, 1999 typed communication from Caldarola to Pozzi, in which Caldarola listed his new address in New York, "1 Rose Lane, Brewster New York." The cover sheet states:

> Tony Czarnecki suggested that this information should be shared with the DA's office since he seems to be claiming an entirely "new" New York address. They might want to check on voter registration, children registered in school.

By its date and contents, it is clear that this fax is relevant only to the County's and District Attorney's efforts to prove the case against Caldarola following his arrest, and not to the issue of probable cause. In fact, none of the investigatory "steps" that defendants "failed" to take are relevant to my evaluation of the evidence that they actually had before them as of July 12, 1999.

this, Caldarola claims that when he called in his absence from work (due to his injury), he provided his family's Connecticut telephone number as an "alternative" number where he could be reached. In fact, copies of daily "call-in" sheets provided by plaintiff show that Caldarola did begin providing a "203" (Connecticut) area code telephone number as of June 1, 1998. Between June 1, 1998, and July 12, 1999 (the date he was arrested), these sheets show that Caldarola called in and either provided only the "203" number, or no telephone number, on all but a limited number of occasions.[5] Caldarola argues that Calabrese had these records in his possession prior to his decision to arrest.

In late June 1999, the County Attorney transferred the active investigation files on COs under surveillance to the Special Investigations Unit (SIU) of the County's Department of Public Safety ("DPS") (the County's police force). These cases were assigned to Captain Paul Stasiatis for review to determine whether files revealed evidence that criminal acts had been committed. Plaintiff claims that D'Aliso instructed Stasiatis to review the files quickly. Lieutenant Christopher Calabrese assisted Stasiatis in reviewing the Caldarola file, including the investigation of the plaintiff. Plaintiff alleges that Calabrese was also told to investigate "as soon as possible," and that the investigation had to be completed by July 12, 1999.

Based on the investigation file, Calabrese concluded that there was probable cause to arrest plaintiff. Calabrese himself did not interview anyone in connection with the investigation of Caldarola, nor did he review any records other than those in the file he received from Stasiatis.

On or about July 8, 1999, the County presented the results of a number of investigations, including that of plaintiff, to the District Attorney's office for review. On July 9, 1999, Assistant District Attorney Mike Hughes spoke with Calabrese. Calabrese testified in his deposition that "Hughes expressed the opinion that he would like more probable cause to effect a prosecution." (Lovett Aff. at Ex. 2 at 13.) After he was asked again in the deposition whether Hughes said he wanted "more probable cause," Calabrese continued:

A: He wanted more probable cause for his prosecution.

Q: Did he say anything about an arrest?

A: Not specifically. He was talking more along the lines of prosecution.

. . . .

He wished that we had more probable cause, because he would need more for a prosecution.

Q: What did you understand him to be telling you?

A: Specifically that he wanted more probable cause, you know, when it came time to prosecute the charge.

Q: Did he tell you, in words or substance, he needed more facts, more proof?

. . . .

A: He said he wanted more evidence or facts, whichever word he used, something to that substance, to effect the prosecution of Mr. Caldarola.

---

**5.** On approximately thirteen occasions, Caldarola provided the same New York number that he had been providing prior to June 1, 1998. On approximately six occasions, the sheet indicated he would be available at the New York number until a certain time in the morning (usually between 9 a.m. or 10 a.m.), after which he could be reached in Connecticut.

Q: Did he say anything with respect to the words probable cause?

. . . .

A: He said he would like more probable cause.

. . . .

Q: What is the difference between probable cause and more probable cause, as you understand it?

A: As I understand it, from a police point of view you get to a level of probable cause when, again, a reasonable person will believe you have enough to believe that a person has committed a crime. From a prosecutorial point of view they would like to have additional information and facts and probable cause to be able to effect a prosecution and a guilty verdict.

(Lovett Aff. at Ex. 2 at 16–18.) Defendants contend that Hughes merely requested additional documents that had been referred to in the papers presented to him the previous day.

Calabrese stated that he reported his conversation with Hughes to Stasaitis, and asked for more time for the investigation. (Id. at 24.) Stasaitis testified in his deposition that "Hughes had said that the case needed more work." (Lovett Aff. at Ex. 1 at 45–56.). According to Stasaitis, he told Commissioner D'Aliso that "ADA Hughes has indicated that the case needed more work before he wanted to take it to prosecution." (Id. at 49–50.) Calabrese was also present during this conversation. Stasaitis recalled D'Aliso asking him whether they had "enough for an arrest," to which Calabrese replied that they did.

(Id. at 52.) D'Aliso told them to go ahead with the arrest.

On July 12, 1999, Calabrese executed a felony complaint against Caldarola, charging him with vacating "his position as a Correction Officer ... under the New York State Public Officers law, Section 30.1.d." and thereafter unlawfully collecting his full salary from the County. Plaintiff was arrested on July 12, 1999.[6] He was suspended immediately without pay. In October 1999 the DOC scheduled an administrative hearing to determine whether Caldarola was in compliance with Section 30.

On February 10, 2000, the defendant moved to dismiss the case on the grounds that the state would not be able to prove the case beyond a reasonable doubt. The People did not oppose the motion, and the case was dismissed. (Lovett Aff. at Ex. 6.) Shortly thereafter, plaintiff's suspension was rescinded and he was restored to his status prior to the suspension.

## CONCLUSIONS OF LAW

Summary judgment is appropriate where there are no genuine issues of material fact and the movant is entitled to judgment as a matter of law. See Fed. R.Civ.P. 56(c); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247–50, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). A genuine issue for trial exists if, based on the record as a whole, a reasonable jury could find in favor of the non-movant. See Liberty Lobby, 477 U.S. at 248, 106 S.Ct. 2505. In making its determination, the court must resolve all ambiguities and draw all reasonable inferences in favor of the non-movant. See id. at 255, 106 S.Ct. 2505. To defeat sum-

---

6. The circumstances of plaintiff's arrest and transport to the police station for booking, and to the courthouse for arraignment, are the subject of another suit brought before this court by Caldarola, among others, claiming violations of his Fourth Amendment rights, which I recently dismissed. See Caldarola v. County of Westchester, 142 F.Supp.2d 431 (S.D.N.Y.2001).

mary judgment, the non-moving party must go beyond the pleadings and "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). When opposing a motion for summary judgment, it is not sufficient for the non-moving party to present evidence that is conclusory or speculative, with no basis in fact. *See Liberty Lobby*, 477 U.S. at 249–50, 106 S.Ct. 2505.

### 1. False Arrest

■ The elements of a claim of false arrest under § 1983 are "substantially the same" as the elements of a false arrest claim under New York law. *See Hygh v. Jacobs*, 961 F.2d 359, 366 (2d Cir.1992). Under New York law, "a plaintiff claiming false arrest must show, inter alia, that the defendant intentionally confined him without his consent and without justification." *Weyant v. Okst*, 101 F.3d 845, 852 (2d Cir.1996).

■ The existence of probable cause to arrest is a complete defense to a false arrest claim, whether under state law or under § 1983. *See Weyant*, 101 F.3d at 852. "Courts evaluating probable cause must consider those facts available to the officer at the time of the arrest and immediately before it." *Lowth v. Town of Cheektowaga*, 82 F.3d 563, 569 (2d Cir. 1996). Probable cause exists when there are "facts and circumstances 'sufficient to warrant a prudent man in believing that the [suspect] had committed or was committing an offense.'" *Id.* (quotations omitted); *see Dunaway v. New York*, 442 U.S. 200, 208, n. 9, 99 S.Ct. 2248, 60 L.Ed.2d 824 (1979) (probable cause to arrest exists when police officers have knowledge or reasonably trustworthy information of facts and circumstances that are sufficient

to warrant a person of reasonable caution in the belief that the person to be arrested has committed or is committing a crime.)

■ Whether probable cause existed is a question that may be determined as a matter of law on a motion for summary judgment if there is no dispute with regard to the pertinent events and knowledge of the officers. *Weyant*, 101 F.3d at 852. Here, defendants have the burden to establish that they had probable cause. *See Raysor v. Port Auth. of New York & New Jersey*, 768 F.2d 34, 40 (2d Cir.1985); *Wu v. City of New York*, 934 F.Supp. 581, 586 (1996). To meet their burden, defendants must show, by admissible evidence, that they have a quantum of evidence "more than rumor, suspicion, or even a strong reason to suspect." *Wu*, 934 F.Supp. at 586 (quoting *United States v. Fisher*, 702 F.2d 372, 375 (2d Cir.1983)). Because arrests cannot be based on mere suspicion, *see Wagner v. County of Cattaraugus*, 866 F.Supp. 709, 714 (W.D.N.Y.1994) (quoting *Papachristou ·v. City of Jacksonville*, 405 U.S. 156, 159, 92 S.Ct. 839, 31 L.Ed.2d 110 (1972)), the facts relied upon by an arresting officer must not be susceptible of an innocent or ambiguous explanation. *See Roberts v. City of New York*, 753 F.Supp. 480, 483 (S.D.N.Y.1990).

■ As a threshold matter, the fact that Calbrese may have relied entirely on the private investigator's report, and did not conduct any additional investigation, does not preclude a finding of probable cause. Probable cause may be based wholly on information received from a third party. *See Aguilar v. Texas*, 378 U.S. 108, 114, 84 S.Ct. 1509, 1514, 12 L.Ed.2d 723 (1964) However, when information is provided by an informant, there must be a sufficient combination of "basis of knowledge," "veracity" of the informant, and "reliability" of the report, which, under the "totality of the circumstances"

standard of *Illinois v. Gates,* 462 U.S. 213, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983), are sufficient to permit reliance on the information as a basis for probable cause.

Unfortunately, the record contains very little evidence from which I would be able to conclude that the private investigators hired by the County meet the requirements under *Gates.* I know the basis of the informant's knowledge, but nothing about "veracity" or "reliability." (I do not know, for example, if the investigator is licensed, or if he has provided reliable information in the past). I cannot conclude as a matter of law that the *Gates* factors are satisfied. Thus, I must deny the motion for summary judgment on the false arrest claim. Accordingly, I do not reach defendants' arguments that the information provided in the Copstat report provided probable cause for arrest.

2. Malicious Prosecution

■ Plaintiffs' complaint also sets forth claims for malicious prosecution against each of the defendants. To prevail on a claim for malicious prosecution, plaintiffs must show: (1) the commencement or continuation of a criminal proceeding, (2) its termination favorable to the plaintiffs, (3) the absence of probable cause, and (4) malice. *Colon v. City of New York,* 60 N.Y.2d 78, 82, 468 N.Y.S.2d 453, 455, 455 N.E.2d 1248 (1983); *Martin v. City of Albany,* 42 N.Y.2d 13, 16, 396 N.Y.S.2d 612, 614, 364 N.E.2d 1304 (1977). *See also Russo v. New York,* 672 F.2d 1014, 1018 (2d Cir.1982). The existence of probable cause for the initiation of criminal proceedings against Caldarola is determined by essentially the same inquiry as probable cause for the arrest, *see Colon,* 60 N.Y.2d at 82, 468 N.Y.S.2d at 455, 455 N.E.2d 1248 ("[p]robable cause consists of such facts and circumstances as would lead a reasonably prudent person to believe plaintiff guilty."). As I held above, there are disputed issues of fact as to whether defendants had probable cause to arrest based on the information provided to them by the private investigator.

■ However, defendant's motion for summary judgment on the malicious prosecution claim can be granted on the grounds that there is absolutely no evidence in the record of malice on the part of any defendants. The malice element of a malicious prosecution action requires a showing that the defendant "commenced the prior criminal proceeding due to a wrong or improper motive, something other than a desire to see the ends of justice served." *Nardelli v. Stamberg,* 44 N.Y.2d 500, 503, 406 N.Y.S.2d 443, 445, 377 N.E.2d 975 (1978). Another court has explained that there must be "a showing of some deliberate act punctuated with awareness of 'conscious falsity' to establish malice." *Best v. Genung's Inc.,* 46 A.D.2d 550, 363 N.Y.S.2d 669, 672 (3d Dep't 1975) (citing *Munoz v. City of New York,* 18 N.Y.2d 6, 9, 271 N.Y.S.2d 645, 649, 218 N.E.2d 527 (1966)). Although plaintiffs do allege (in conclusory fashion) that the County's motivation in arresting Caldarola was to retaliate against him for his union activities, there is not a scintilla of evidence in the record that this was the case.

Defendants' motion to dismiss plaintiff's malicious prosecution claim in granted.

REMAINING MOTIONS

Plaintiff seeks leave from this court to amend the complaint to add Louis D'Aliso as a defendant, to dismiss William DeCiuceis, to add a New York State malicious prosecution claim, and to add what plaintiff refers to as a claim for "Liberty deprivation" against Andrew Spano.

**1. Motion to Dismiss Against DeCiucesis**

The request to dismiss DeCiuceis is granted with prejudice, as there is no evidence in the record of DeCiuceis' involvement in the arrest. He is dismissed without prejudice.

**2. Motion to Add State Malicious Prosecution Claim**

In light of my holding above, granting defendants' motion to dismiss plaintiff's malicious prosecution claim under § 1983 for failure to present any evidence of malice, it would be futile to add the state malicious prosecution claim. That motion is denied.

**3. Motion to Add D'Aliso as a Defendant**

The request to add D'Aliso as a defendant is granted. The request was made on October 10, 2000, ten days prior to the deadline for naming additional parties. There is evidence in the record that D'Aliso approved Caldarola's arrest on the basis of the information provided to him by Calabrese and Stasiatis. If there were no probable cause for the arrest, D'Aliso could be liable for false arrest. *See Foman v. Davis*, 371 U.S. 178, 182, 83 S.Ct. 227, 230, 9 L.Ed.2d 222 (1962) (holding that leave to serve an amended complaint should be "freely granted"); *Pangburn v. Culbertson*, 200 F.3d 65, 70 (2d Cir.1999).

**4. Motion to Add a "Liberty Deprivation" Claim Against Spano**

■ Plaintiffs may not add a "liberty deprivation" claim against Andrew Spano for statements he allegedly made about plaintiff at the July 12, 1999 press conference following Caldarola's arrest. In his original complaint, plaintiff named Spano as an individual defendant, and alleged that Spano:

orchestrated a press conference at which [he] publicly and for the media identified plaintiff by name as a criminal, reported his arrest and prosecution and with a view towards deliberately destroying Plaintiff's reputation and career in law enforcement, Spano ... released to the media at that press conference a photograph of Plaintiff which photograph was, as a result, published on the front page of the Gannett Suburban Newspapers on July 13, 1999, along with explicit allegations of criminal wrongdoing.

(Compl. at ¶ 18–19.) Spano and other defendants originally named in the complaint filed a motion to dismiss the claims in the original complaint. Plaintiff did not oppose the motion, but rather withdrew the claims against Spano and the other two defendants. I dismissed the claims against these defendants without prejudice, but plaintiff has apparently forgotten or disregarded my reason for doing so. I told plaintiff he could refile against Spano if he could advance any factual allegations that Spano was involved in the decision to arrest Caldarola. (See June 22, 2000 Hrg. Tr.)

This is not what plaintiff has done. Instead, he advances a new due process/defamation claim, entirely unrelated to the false arrest claim. This is improper. Plaintiff has another action before this court involving the events following his arrest, including the very press conference of which he complains here. And, as I have already held in that case, under *Paul v. Davis*, 424 U.S. 693, 701, 96 S.Ct. 1155, 1160, 47 L.Ed.2d 405 (1976), and *Rosenberg v. Martin*, 478 F.2d 520, 525 (2d Cir.1973), plaintiff has no such claim. *See Caldarola v. County of Westchester*, 142 F.Supp.2d 431 (S.D.N.Y.2001). Plaintiff cannot now assert similar claims here.

Finally, plaintiffs' caption to his memorandum of law in support of this motion

454

refers to Rocco Pozzi, Robert Davis, and Andrew Spano, in addition to the defendants already named (DeCiuceis and Calabrese). Because neither the proposed amended complaint, nor any portion of the argument in plaintiff's supporting papers makes any further substantive reference to Mssrs. Pozzi or Davis, I assume plaintiff does not, in fact, seek to revisit their earlier dismissal from this case.

### CONCLUSION

Defendants' motion for summary judgment on the false arrest claim is denied. The malicious prosecution claims are dismissed as to all defendants. The motion to amend the complaint is granted in part—plaintiffs may add Louis D'Aliso as a defendant and the claims against William DeCiucies are dismissed—and otherwise denied.

This constitutes the order and decision of the court.