**Rocco CALDAROLA, Plaintiff–Counter–Defendant–Appellee,**

v.

**Christopher CALABRESE, individually, Defendant–Counter–Claimant–Appellant,**

Andrew J. Spano, C.O.W. County Clerk, individually, Robert S. Davis, individually, and Rocco Pozzi, individually, Defendants,

**William DeCiuceis, individually, and The County of Westchester, Defendants–Counter–Claimants.**

**Docket No. 01–9053.**

United States Court of Appeals, Second Circuit.

Argued: May 13, 2002.

Decided: July 31, 2002.

Matthew T. Miklave, New York City (Deborah S. Markowitz, Epstein, Becker & Green, New York City, of counsel), for Appellant.

Drita Nicaj, White Plains, N.Y. (Lovett & Gould, White Plains, NY, of counsel), for Appellee.

Before VAN GRAAFEILAND, MESKILL and B.D. PARKER, Circuit Judges.

MESKILL, Circuit Judge.

This interlocutory appeal by defendant-appellant Lieutenant Christopher Calabrese (Calabrese) requires us to address the intersecting legal themes of qualified immunity and the use of informants to support probable cause to arrest. The United States District Court for the Southern District of New York, McMahon, J., denied Calabrese's motion for summary judgment on plaintiff-appellant Rocco Caldarola's (Caldarola) claim for false arrest. The district court concluded that it could not determine the reliability of the private investigation firms on whose reports Calabrese relied in making his probable cause determination and declined to reach Calabrese's arguments that probable cause did, in fact, exist, and that he was entitled to qualified immunity. For the reasons that follow, we reverse the order of the district court.

## BACKGROUND

Caldarola, a Westchester County Department of Correction Officer, injured his thumb in the line of duty, filed a disability claim and, pursuant to Section 207–c of New York General Municipal Law, received medical and salary benefits for over a year. See N.Y. Gen. Mun. Law § 207–c. In January 1998, newly elected Westchester County Executive Andrew Spano (Spano) appointed Rocco Pozzi (Pozzi) Acting Commissioner of the Department of Correction and later formalized the appointment.

In an effort to determine whether some corrections officers might be abusing the job injury benefits program, Pozzi asked the head of the Department of Correction's Attendance Management Unit (AMU) to provide him with a list of corrections officers suspected of falsely claiming or exaggerating injuries. Caldarola's name was on the list provided to Pozzi. Members of the Department of Correction had heard unconfirmed rumors that Caldarola was operating a landscaping business while receiving benefits. If true, this likely would have constituted a violation of Section 207–c because Caldarola probably would have been able to return to his job. See id. (municipality shall pay officer injured on the job "the full amount of his regular salary or wages until his disability arising therefrom has ceased").

Pozzi proposed conducting limited surveillance to determine whether the corrections officers on the list were, in fact,

improperly receiving job injury benefits. To keep the investigations confidential, County Executive Spano authorized the use of private investigation firms to conduct the surveillance. The county selected the firms that were to do the investigations.

Louis D'Aliso (D'Aliso), the Commissioner of the Westchester County Department of Public Safety, instructed Paul Stasaitis (Stasaitis), the commanding officer of the Special Investigations Unit (SIU), to retrieve the investigatory files for five corrections officers from the Westchester County Attorney's Office. D'Aliso directed Stasaitis to review the files to determine if they detailed any criminal acts by the corrections officers. Stasaitis kept four files for himself and, with the permission of D'Aliso, assigned the Caldarola file to Calabrese, a lieutenant in charge of the major case squad (but not a member of the SIU).

Instead of revealing that Caldarola was operating a landscaping business, the information contained in the investigatory file led Calabrese to conclude that Caldarola had moved from New York to Connecticut. If true, Caldarola's move would have constituted a violation of Section 30 of the New York Public Officers Law. *See* N.Y. Pub. Off. Law § 30(1)(d) (an office shall become vacant if the incumbent ceases to be an inhabitant of the state). At some point during his investigation, Calabrese spoke with Assistant District Attorney Mike Hughes (Hughes) to go over the investigative file that had been assembled on Caldarola. Calabrese recalled Hughes expressing concern that he needed "more probable cause" to effect a prosecution of Caldarola. Calabrese understood Hughes to mean that more evidence was necessary to secure a criminal conviction. Calabrese then requested from Stasaitis additional time to investigate Caldarola. Stasaitis denied his request.

When asked by Commissioner D'Aliso whether there was enough information to arrest Caldarola, Calabrese responded in the affirmative and, on July 12, 1999, he effected the arrest of Caldarola for grand larceny in the third degree. On July 16, 1999, Caldarola was suspended without pay pending a hearing on disciplinary charges. Caldarola filed a motion in state court seeking dismissal of the criminal charge because the prosecution could not prove it beyond a reasonable doubt. The district attorney did not oppose the motion. On February 10, 2000, the criminal charge was dismissed and, on February 18, 2000, the county withdrew the disciplinary charges and reinstated Caldarola with back pay.

On April 17, 2000, Caldarola filed this suit against Calabrese, Pozzi, Spano, two other individuals and Westchester County seeking money damages pursuant to 42 U.S.C. § 1983. *See, e. g., Baker v. McCollan,* 443 U.S. 137, 99 S.Ct. 2689, 61 L.Ed.2d 433 (1979). On May 24, 2000, in response to a motion to dismiss by the defendants, Caldarola voluntarily withdrew three of his claims, leaving only the claims for false arrest and malicious prosecution. On June 22, 2000, pursuant to the same motion by the defendants, the district court dismissed without prejudice Caldarola's false arrest and malicious prosecution claims against Pozzi, Spano and another individual defendant. The only remaining claims were for false arrest and malicious prosecution against Calabrese, the county and one other defendant. On the remaining defendants' motion for summary judgment, the district court found that there was no evidence of malice on the part of the defendants and dismissed the malicious prosecution charge. *Caldarola v. DeCiuceis,* 142 F.Supp.2d 444, 452 (S.D.N.Y.

2001). Finding that the private investigation firms could not be deemed reliable, the district court declined to decide whether the information contained in the investigative file established probable cause to arrest Caldarola. *Id.* The district court thus denied Calabrese's motion for summary judgment on Caldarola's false arrest claim, and Calabrese timely appealed.

## DISCUSSION

### I. *Standard of Review*

As the analysis required for summary judgment is a legal one, we "review *de novo* the district court's grant of summary judgment, construing the evidence in the light most favorable to the nonmoving party." *Giordano v. City of New York,* 274 F.3d 740, 746 (2d Cir.2001) (citing *Tenenbaum v. Williams,* 193 F.3d 581, 593 (2d Cir.1999)). Summary judgment is appropriate if there are no genuine issues of material fact and the movant is entitled to judgment as a matter of law. Fed. R.Civ.P. 56(c).

The party against whom summary judgment is sought, however, "must do more than simply show that there is some metaphysical doubt as to the material facts.... [T]he nonmoving party must come forward with specific facts showing that there is a *genuine issue for trial." Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586–87, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986) (quotation marks and citations omitted).

### II. *Qualified Immunity*

#### A.

■ "Qualified immunity is 'an entitlement not to stand trial or face the other burdens of litigation.' " *Saucier v. Katz,* 533 U.S. 194, 200, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001) (quoting *Mitchell v. Forsyth,* 472 U.S. 511, 526, 105 S.Ct. 2806, 86 L.Ed.2d 411 (1985)). The principle of qualified immunity serves important practical purposes in our system. It shields government officials from liability for their performance of discretionary actions and offers them the benefit of avoiding costly, time-consuming and, ultimately unsuccessful litigation. *See Anderson v. Creighton,* 483 U.S. 635, 638, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987); *Martinez v. Simonetti,* 202 F.3d 625, 634 (2d Cir.2000).

■■ When considering the issue of qualified immunity we must first determine whether—viewed in the light most favorable to the injured party—the facts alleged demonstrate that the officer's conduct violated a constitutional right. *Saucier,* 533 U.S. at 201, 121 S.Ct. 2151. If so, we must determine whether that right was clearly established. In other words, "[t]he contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Anderson,* 483 U.S. at 640, 107 S.Ct. 3034; *see Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982) (noting that a court should determine "not only the currently applicable law, but whether that law was clearly established at the time an action occurred"). This inquiry is, in essence, a determination "whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Saucier,* 533 U.S. at 202, 121 S.Ct. 2151; *see Malley v. Briggs,* 475 U.S. 335, 341, 106 S.Ct. 1092, 89 L.Ed.2d 271 (1986) (stating that qualified immunity protects "all but the plainly incompetent or those who knowingly violate the law"). If the law was clearly established that the officer's conduct violated a constitutional right, qualified immunity is inappropriate. If, however, "the law at that time was not clearly established, an official could not reasonably be expected to anticipate sub-

sequent legal developments, nor could he fairly be said to 'know' that the law forbade conduct not previously identified as unlawful." *Harlow*, 457 U.S. at 818, 102 S.Ct. 2727. In such a case, courts must grant an officer qualified immunity.

### B.

■■ "The denial of summary judgment is ordinarily an interlocutory decision, not a 'final decision' appealable under 28 U.S.C. § 1291." *Marshall v. Sullivan*, 105 F.3d 47, 53 (2d Cir.1996). When a court denies a motion for summary judgment based on a denial of qualified immunity, however, that determination is appealable under the collateral order doctrine when it is a legal conclusion made with reference only to undisputed facts. *Johnson v. Jones*, 515 U.S. 304, 313, 115 S.Ct. 2151, 132 L.Ed.2d 238 (1995) (citing *Mitchell v. Forsyth*, 472 U.S. 511, 530 n. 10, 105 S.Ct. 2806, 86 L.Ed.2d 411 (1985)); *Marshall*, 105 F.3d at 53. When an officer's entitlement to qualified immunity hinges on a factual dispute, we lack appellate jurisdiction to determine the qualified immunity issue. *See Behrens v. Pelletier*, 516 U.S. 299, 312–13, 116 S.Ct. 834, 133 L.Ed.2d 773 (1996).

■ Caldarola claims that we do not have jurisdiction over this interlocutory appeal because the district court's determination was not a legal one made with reference to undisputed facts. *See Johnson*, 515 U.S. at 313, 115 S.Ct. 2151. A cursory glance at the district court's memorandum and order belies Caldarola's contention. Specifically, the district court stated, "I cannot conclude as a matter of law that the *Gates* factors [regarding the reliability of tips] are satisfied. Thus, I must deny the motion for summary judgment on the false arrest claim." *Caldarola*, 142 F.Supp.2d at 452. The district court's decision was a legal one: it applied the undisputed facts in the record to a legal standard. We thus have jurisdiction to hear this interlocutory appeal and now turn to the merits of Calabrese's defense of qualified immunity.

### C.

■■ Caldarola's § 1983 claim for false arrest derives from an individual's right to remain free from unreasonable seizures. This includes the right to remain free from arrest absent probable cause. *Weyant v. Okst*, 101 F.3d 845, 852 (2d Cir.1996). When viewed in the light most favorable to Caldarola, *Saucier*, 533 U.S. at 201, 121 S.Ct. 2151, his complaint alleges that he was arrested without probable cause, a violation of his constitutional rights. There is no dispute that this broad right to be free of arrest without probable cause was clearly established at the time of Caldarola's arrest. *Lee v. Sandberg*, 136 F.3d 94, 102 (2d Cir.1997) ("The right not to be arrested without probable cause is a clearly established right."). However, it was equally well established that the existence of probable cause is an absolute defense to a false arrest claim and affords the arresting officer qualified immunity from litigation. *See Weyant*, 101 F.3d at 852. We must determine whether a reasonable officer could conclude that the circumstances here established the necessary probable cause for Calabrese to arrest Caldarola; in short, we must consider whether a reasonable officer could have believed that the specific action taken by Calabrese was foreclosed by clearly established law. *See Saucier*, 533 U.S. at 201, 121 S.Ct. 2151 ("This inquiry, it is vital to note, must be undertaken in light of the specific context of the case, not as a broad general proposition."); *cf. Anderson*, 483 U.S. at 640, 107 S.Ct. 3034 (stating that it was erroneous for the court of appeals simply to conclude

that the right of a person to be free from warrantless searches was clearly established and to "refuse[ ] to consider the argument that it was *not* clearly established that the circumstances with which [the officer] was confronted did not constitute [exceptions to that general rule]").

■ When determining whether probable cause exists courts "must consider those facts available to the officer at the time of the arrest and immediately before it." *Lowth v. Town of Cheektowaga,* 82 F.3d 563, 569 (2d Cir.1996); *see Anderson,* 483 U.S. at 641, 107 S.Ct. 3034 ("The relevant question ... is the objective (albeit fact-specific) question whether a reasonable officer could have believed [the officer's conduct] to be lawful, in light of clearly established law and the information the ... officers possessed."). "In general, probable cause to arrest exists when the officers have knowledge or reasonably trustworthy information of facts and circumstances that are sufficient to warrant a person of reasonable caution in the belief that the person to be arrested has committed or is committing a crime." *Weyant,* 101 F.3d at 852 (citing *Dunaway v. New York,* 442 U.S. 200, 208 n. 9, 99 S.Ct. 2248, 60 L.Ed.2d 824 (1979)).

■ A district court must look to the "totality of the circumstances" in deciding whether probable cause exists to effect an arrest. *Illinois v. Gates,* 462 U.S. 213, 233, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983); *Bernard v. United States,* 25 F.3d 98, 102 (2d Cir.1994). In looking to the totality of the circumstances, courts must be aware that "probable cause is a fluid concept—turning on the assessment of probabilities in particular factual contexts—not readily, or even usefully, reduced to a neat set of legal rules." *Gates,* 462 U.S. at 232, 103 S.Ct. 2317. "Finally, we have said that in the context of a qualified immunity defense to an allegation

of false arrest, the defending officer need only show 'arguable' probable cause." *Martinez,* 202 F.3d at 634. This is because at its heart, "[t]he concern of the immunity inquiry is to acknowledge that reasonable mistakes can be made as to the legal constraints on particular police conduct." *Saucier,* 533 U.S. at 205, 121 S.Ct. 2151. "Officers can have reasonable, but mistaken, beliefs as to the facts establishing the existence of probable cause ... and in those situations courts will not hold that they have violated the Constitution." *Id.* at 206, 121 S.Ct. 2151. Therefore, in situations where an officer may have reasonably but mistakenly concluded that probable cause existed, the officer is nonetheless entitled to qualified immunity. *See Lennon v. Miller,* 66 F.3d 416, 423 (2d Cir.1995) (" '[I]t is inevitable that law enforcement officials will in some cases reasonably but mistakenly conclude that probable cause is present, and we have indicated that in such cases those officials ... should not be held personally liable.' " (quoting *Anderson,* 483 U.S. at 641, 107 S.Ct. 3034)).

■ We are concerned here with determining the existence of probable cause based on information gleaned from informants. In the past, courts confronted with this situation traditionally employed a two-pronged approach based on the Supreme Court decisions of *Aguilar v. Texas,* 378 U.S. 108, 84 S.Ct. 1509, 12 L.Ed.2d 723 (1964), and *Spinelli v. United States,* 393 U.S. 410, 89 S.Ct. 584, 21 L.Ed.2d 637 (1969). This approach focused—in a rather rigid manner—on the reliability or veracity of the informant and on the basis for the informant's knowledge. *See Gates,* 462 U.S. at 228–29, 228 n. 3, 103 S.Ct. 2317. After the Supreme Court's decision in *Illinois v. Gates,* however, it is clear that these are but two of several "relevant considerations" when determining the exis-

tence of probable cause based on an informant's tip. *See id.* at 233, 103 S.Ct. 2317. "[A] deficiency in one may be compensated for, in determining the overall reliability of a tip, by a strong showing as to the other, or by some other indicia of reliability." *Id.*

The Supreme Court has recognized, for example, that "if an unquestionably honest citizen comes forward with a report of criminal activity—which if fabricated would subject him to criminal liability— . . . rigorous scrutiny of the basis of his knowledge [is] unnecessary." *Id.* at 233–34, 103 S.Ct. 2317 (citing *Adams v. Williams,* 407 U.S. 143, 92 S.Ct. 1921, 32 L.Ed.2d 612 (1972)). More recently, the Supreme Court noted in *Florida v. J.L.,* 529 U.S. 266, 270, 120 S.Ct. 1375, 146 L.Ed.2d 254 (2000), that an anonymous tip is "[u]nlike a tip from a known informant whose reputation can be assessed and who can be held responsible if her allegations turn out to be fabricated." We have similarly recognized that the language in *Aguilar* and *Spinelli* was directed toward the reliability of professional criminal informants. *United States v. Rollins,* 522 F.2d 160, 164 (2d Cir.1975); *United States v. Burke,* 517 F.2d 377, 380 (2d Cir.1975). In the case of "an identified bystander with no apparent motive to falsify," however, the information they provide has "a peculiar likelihood of accuracy." *Rollins,* 522 F.2d at 164; *see Miloslavsky v. AES Engineering Society,* 808 F.Supp. 351, 355 (S.D.N.Y.1992) ("[I]t is well-established that a law enforcement official has probable cause to arrest if he received his information from some person,· normally the putative victim or eyewitness, who it seems reasonable to believe is telling the truth."), *aff'd,* 993 F.2d 1534 (2d Cir.1993); *see also People v. Hicks,* 38 N.Y.2d 90, 94, 378 N.Y.S.2d 660, 664–65, 341 N.E.2d 227, 230 (1975) ("[W]e cannot hold that citizen informers are as inherently suspicious individuals as the underworld denizen upon whose oath, out of necessity, law enforcement officials must often rely. To do so would be to denigrate the character of public-spirited citizens. Instead, such civic-mindedness should be encouraged and applauded.").

D.

The investigative file given to Calabrese by Stasaitis, on which Calabrese relied in making his probable cause determination, contained reports from two private investigation firms, attendance records from the AMU and a videotape. One report, from Copstat Security, contained a brief overview of the firm's conclusions based on its investigation and a more detailed summary of the specific actions taken during the investigation. The other report, from Compass Investigators and Adjusters, concerned a deed and a mortgage agreement signed by Caldarola for a house in New Fairfield, Connecticut. The attendance reports detailed the many times Caldarola had telephoned the AMU to report that he would not be reporting to work. He left a telephone number where he could be reached each time he called. Caldarola left a New York telephone number some times, a Connecticut telephone number other times, and on several occasions left both a New York and Connecticut number. Finally, the videotape, taken by an investigator employed by Copstat, showed Caldarola at a house on two occasions, taking children to school and shopping at a local gas station/convenience store. The investigator identified the house, school and gas station/convenience store as being located in Connecticut.

The Copstat report revealed that investigators were initially told that Caldarola's address was 30 Jefferson Avenue, White Plains, NY. When the investigators traveled to that address in early April 1999

and rang the doorbell there was no response. Three personal interviews with residents of Jefferson Avenue elicited similar information: the Caldarolas did not live at 30 Jefferson Avenue at the time of the investigators' visit, and the previous owners had sold the house between late 1998 and early 1999 to "a Hispanic family." One neighbor who did not give her name to the investigators stated that she believed Caldarola moved to Florida. Another, Shem Guilbory, stated that the Caldarolas that had lived at 30 Jefferson Avenue were elderly and not in Caldarola's age group. Another, who apparently also did not give his name to the investigators, stated that he thought the Caldarolas "moved upstate" but did not know where. Further, a telephone interview with a Mr. Valente of 15 Jefferson Avenue revealed that he believed that Rocco Caldarola Sr. had sold his residence at 30 Jefferson Avenue "and [had gone] to live with his son in Connecticut." The investigators also interviewed Carlos Santiago, an employee at the White Plains Post Office. This interview revealed that Rocco Caldarola had not received mail at 30 Jefferson Avenue for over one year. Mrs. Stella Caldarola had her mail forwarded to a Florida address. There was no forwarding address for either Rocco Caldarola Sr. or Jr. On a later visit to 30 Jefferson Avenue the investigators interviewed the apparent owner of the home, who stated that she and her husband had bought the house at 30 Jefferson Avenue in May 1998 from Rocco Caldarola Sr. The woman did not give her name.

A Department of Motor Vehicles search listed 197 Pinewood Road, Hartsdale, NY, as another address for Rocco Caldarola. The investigators went to the address and spoke with a man identified as Mr. Dorsback who stated that he had lived at 195 Pinewood Road for approximately thirty-five years. Mr. Dorsback stated that he

had never heard of Rocco Caldarola and that a family named Figura had lived at 197 Pinewood Road for approximately thirteen years. On further questioning, Mr. Dorsback concluded that Caldarola was the husband of the Figuras' daughter because he knew that the daughter had married a corrections officer. When shown a picture of Caldarola, Mr. Dorsback stated that he was "about 100% sure it was the man that married [the] Figuras' daughter." Dorsback stated that Caldarola had never lived at 197 Pinewood Road.

The Copstat report also states that "[b]ased on information that Mr. Caldarola may be residing at Paradise Court, New Fairfield, CT, a Copstat investigator went to the location." The report does not indicate where Copstat learned of the Paradise Court address. On three occasions, two of which were videotaped, the investigator saw Caldarola emerge from the house in Connecticut, drop children off at school, stop at a gas station/convenience store and return to the house. Further investigation at the New Fairfield town hall entailing a review of records relating to the Paradise Court residence revealed that Rocco Caldarola was the owner of record and that several notices of health violations had been sent to Caldarola at the Paradise Court address.

A second report, provided by Compass Investigators and Adjusters, detailed the process of obtaining the deed and other public records related to the Paradise Court address. The report is signed by Laureen Fitzgerald, who is identified as an investigator for Compass. The report states that Caldarola signed a deed and a mortgage for the Paradise Court home and had paid Connecticut property taxes. Additionally, although Caldarola's wife was, at one time, listed on the deed, her name was subsequently removed. Finally, the mortgage document for the Paradise Court

residence stated that the borrower (Caldarola) "shall occupy, establish, and use the Property ... as Borrower's principal residence for at least one year after the date of occupancy, unless Lender otherwise agrees in writing ... or unless extenuating circumstances exist which are beyond Borrower's control." There is no indication that Caldarola sought or was granted a waiver of this clause.

### E.

In its memorandum and order, the district court stated, "I know the basis of the informant's knowledge, but nothing about 'veracity' or 'reliability.' ... Accordingly, I do not reach defendants' arguments that the information provided in the Copstat report provided probable cause for arrest." *Caldarola,* 142 F.Supp.2d at 452. While the district court appropriately looked to the investigators' "veracity" and "reliability" as relevant factors, it erroneously ceased its inquiry into whether there was probable cause after determining that it did not know enough about the private investigation firms hired by the county.

The reliability of the investigators' reports is certainly a consideration that the district court needed to consider. In determining the overall reliability of the reports, however, the district court could have looked to several other factors to outweigh its concern that it did "not know, for example, if the investigator is licensed, or if he has provided reliable information in the past." *Id.; cf. Gates,* 462 U.S. at 233–34, 103 S.Ct. 2317 (describing how deficiencies in one area of inquiry can be outweighed by other considerations).

 Calabrese argues that the investigators should be presumed to be reliable informants because they are not anonymous informers. Specifically, Calabrese argues, "when examining information provided by a known informant or an identified source of information, the information may be presumed to be reliable." Under New York law an identified citizen informant is presumed to be reliable. *People v. Hetrick,* 80 N.Y.2d 344, 349, 590 N.Y.S.2d 183, 185, 604 N.E.2d 732, 734 (1992) ("[B]ecause [the informant] was an identified citizen informant, and not an unnamed informant, there was a 'built-in' basis for crediting her reliability."); *Hicks,* 38 N.Y.2d at 94, 378 N.Y.S.2d at 664–65, 341 N.E.2d at 230. We have endorsed a similar proposition. *See Rollins,* 522 F.2d at 164; *see also Miloslavsky,* 808 F.Supp. at 355, *aff'd,* 993 F.2d 1534 (2d Cir.1993).

In the more specific realm of information furnished on behalf of a company by one of its employees, the Fifth Circuit has held that the identification of the company is enough to identify the informant. *United States v. Fooladi,* 703 F.2d 180, 183 (5th Cir.1983) ("Although the name of the glass company's representative was not disclosed in the affidavit, the name of the company ... was disclosed. At least when the information is furnished on behalf of a company by one of its employees ... disclosure of the company name is sufficient."). In so ruling, the Fifth Circuit recognized, as we did in *Rollins,* 522 F.2d at 164, the limited impact of *Aguilar* and *Spinelli* and stated, "when an average citizen tenders information to the police, the police should be permitted to assume that they are dealing with a credible person in the absence of special circumstances suggesting that such might not be the case." *Id.* (quotation marks omitted). The Seventh Circuit has similarly upheld a finding of probable cause based on a tip from an unidentified bus driver relayed to the police through the bus dispatcher. *See Edwards v. Cabrera,* 58 F.3d 290, 294 (7th Cir.1995). The Seventh Circuit found probable cause for several reasons: (1) the unidentified bus driver was readily identifi-

able by the police (they could have asked the bus company to provide his name); (2) the informant was gainfully employed as a bus driver, thus indicating that the informant was likely not a "random criminal"; and (3) the bus company likely would not look favorably on its employees using its dispatcher to relay false information to the police. *Id.*

■ We have not had occasion to rule definitively on the reliability of information provided to the police by an anonymous employee on behalf of his employer. We approach the issue mindful of the decisions of the Supreme Court and this Court emphasizing the "peculiar likelihood of accuracy" of information provided by private citizens and expressing concern regarding information provided by professional criminal informants. We also recognize that private investigators hired by a county to surveil potential criminal defendants might not be entirely disinterested citizens. They may have an interest in the success of their investigation and may be seen as being a part of the "often competitive enterprise of ferreting out crime." *Johnson v. United States,* 333 U.S. 10, 14, 68 S.Ct. 367, 92 L.Ed. 436 (1948). *But cf. Pa. Bd. of Probation and Parole v. Scott,* 524 U.S. 357, 368, 118 S.Ct. 2014, 141 L.Ed.2d 344 (1998) (stating that parole officers cannot be said to fit within that description). We have no trouble, however, concluding that it was not clearly established that Calabrese lacked probable cause based on the information available to him at the time of the arrest. *See Gates,* 462 U.S. at 233–34, 103 S.Ct. 2317; *Rollins,* 522 F.2d at 164. Calabrese had at his disposal: (1) a summary of interviews and surveillance conducted by several unidentified private investigators employed by an identified private investigation firm that had been hired by his superiors; (2) vid-

eotape footage of Caldarola in Connecticut; (3) a summary of the retrieval of public records by an identified private investigator employed by an identified private investigation firm that had been hired by his superiors; (4) public records, including a mortgage with a clause requiring Caldarola to make the Connecticut home his primary residence with no evidence of a written waiver of that requirement; and (5) attendance records that indicated that Caldarola was often reachable at a Connecticut telephone number.

■ Looking, as we must, at the facts as Calabrese knew them at the time of the arrest, *see Lowth,* 82 F.3d at 569, we conclude that there was arguable probable cause to arrest Caldarola. First, the county hired the investigators and requested the reports on which Calabrese relied. Calabrese was given the Caldarola investigative file by Stasaitis and was instructed to determine whether the information in the file provided probable cause to arrest Caldarola. Certainly he reasonably could have concluded that the firms were reliable because his superiors hired them and, by doing so, had implicitly endorsed their credibility and legitimacy. We cannot expect an officer to question the judgment of his superiors, especially when, as here, he has no basis for doing so. Caldarola had no personal prior experience with these firms. *Cf. Poe v. Leonard,* 282 F.3d 123, 144 (2d Cir.2002) ("Supervisors cannot be expected to reinvent the wheel with every decision, for that is administratively unfeasible; rather, they are entitled to rely upon the decisions of their predecessors or subordinates so long as those decisions do not appear to be obviously invalid, illegal or otherwise inadequate."); *Martinez,* 202 F.3d at 634 (finding that "police officers, when making a probable cause determination, are ... entitled to rely on the allega-

tions of fellow police officers"); *Bernard v. United States,* 25 F.3d 98, 102–03 (2d Cir. 1994) (same). We decline to impose on officers a duty to conduct an independent investigation into the materials provided to them by their superiors. *See Martinez,* 202 F.3d at 635 (finding that "it was error for the trial court to conclude that ... [police officers] had a duty to conduct an independent investigation of the physical evidence before deciding to charge" a suspect).

Second, there is no question about the basis for the investigators' conclusions. Calabrese was presented with documentary evidence, videotape footage, and summaries of personal interviews with neighbors and a post office employee. The overall validity of the reports is thus strengthened because they do not rely on gossip or rumor. *Gates,* 462 U.S. at 234, 103 S.Ct. 2317 ("[E]ven if we entertain some doubt as to an informant's motives, his explicit and detailed description of alleged wrongdoing, along with a statement that the event was observed firsthand, entitles his tip to greater weight than might otherwise be the case."). Third, although the specific investigators were not identified by name in the Copstat report, the investigation firm was clearly identified. *See Fooladi,* 703 F.2d at 183. If needed, the names of those conducting the interviews could be determined. *See Cabrera,* 58 F.3d at 294. Fourth, it is highly unlikely that the investigation firms would allow the use of their names and services for the purpose of disseminating false charges to the police. *See id.* There is nothing in the record to indicate that the fees paid to the investigating firms were dependent on the outcome of the investigation. As we have noted in the past, the peculiar problem of professional criminal informants underlied the concerns outlined in *Aguilar* and *Spinelli* regarding the reliability and veracity of informants. Those concerns all but evaporate when the information is provided by private citizens, *Rollins,* 522 F.2d at 164, and are at the very least reduced in the present circumstances.

Finally, the information contained in the materials reviewed by Calabrese certainly could have led a reasonable officer to conclude that Caldarola had moved to Connecticut. According to the summaries of interviews, Caldarola did not live at either New York address investigated by the Copstat investigators and he was surveilled in Connecticut on several occasions. He had signed a mortgage document pledging to make the Connecticut home his "primary residence" and had called the AMU on many occasions leaving a Connecticut number where he could be reached. *See Gates,* 462 U.S. at 242, 103 S.Ct. 2317 ("[E]ven in making a warrantless arrest an officer 'may rely upon information received through an informant, rather than upon his direct observations, so long as the informant's statement is reasonably corroborated by other matters within the officer's knowledge.' ") (quoting *Jones v. United States,* 362 U.S. 257, 269, 80 S.Ct. 725, 4 L.Ed.2d 697 (1960)).

Caldarola argues that Calabrese could not reasonably have thought that there was probable cause to arrest because ADA Hughes told Calabrese that he needed "more probable cause." We are not persuaded. As Calabrese testified in his deposition, he understood Hughes to be referring to the need for more evidence to convict Caldarola and not a lack of probable cause to arrest Caldarola. Under the circumstances here, this was not an unreasonable understanding. Caldarola also argues that Calabrese did not conduct an investigation independent of the file given to him by Stasaitis. Caldarola claims that if he had done so, Calabrese would have found evidence that Caldarola did, in fact, reside in New York. Calabrese was "not

required to explore and eliminate every theoretically plausible claim of innocence before making an arrest." *Ricciuti v. N.Y.C. Transit Auth.*, 124 F.3d 123, 128 (2d Cir.1997). We consider only information Calabrese relied on in concluding that there was probable cause to arrest Caldarola. The question before us is whether it was reasonable for Calabrese, based on the information available to him at the time, to believe that Caldarola had moved. *Cf. Weyant*, 101 F.3d at 852. Here, it is evident that Calabrese's actions were objectively reasonable or, put differently, that "officers of reasonable competence could disagree on whether the probable cause test was met." *Wachtler v. County of Herkimer*, 35 F.3d 77, 80 (2d Cir.1994) (quotation marks omitted). Calabrese is therefore entitled to qualified immunity on the false arrest charge, and the order of the district court must be reversed.

## CONCLUSION

For the foregoing reasons, we reverse that portion of the district court's order denying Calabrese qualified immunity on the false arrest charge.