10-3789-cv
Pinter v. City of New York

**UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT**

# SUMMARY ORDER

Rulings by summary order do not have precedential effect. Citation to a summary order filed on or after January 1, 2007, is permitted and is governed by Federal Rule of Appellate Procedure 32.1 and this Court's Local Rule 32.1.1.  When citing a summary order in a document filed with this Court, a party must cite either the Federal Appendix or an electronic database (with the notation "summary order"). A party citing a summary order must serve a copy of it on any party not represented by counsel.

At a stated term of the United States Court of Appeals for the Second Circuit, held at the Daniel Patrick Moynihan United States Courthouse, 500 Pearl Street, in the City of New York, on the 18th day of November, two thousand eleven.

PRESENT:

      RALPH K. WINTER,
      JOSEPH M. MCLAUGHLIN,
      JOSÉ A. CABRANES,
          *Circuit Judges.*


- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

ROBERT PINTER,

      *Plaintiff-Appellee,*


   v.                                    No. 10-3789-cv

THE CITY OF NEW YORK, a municipal entity; NEW YORK CITY UNDERCOVER POLICE OFFICER #31107; RAYMOND KELLY, New York City Police Commissioner, individually and in his official capacity; MICHAEL BLOOMBERG, Mayor of New York City, individually and in his official capacity; RAYMOND DIAZ or "JOHN SMITH", the then Commanding Officer of Patrol Borough Manhattan South, individually and in his official capacity; "JOE" BRAILLE, Commander of the Vice Squad of Patrol Borough Manhattan South, individually and in his official capacity; ANTHONY IZZO, Commander of the Organized Crime Bureau of the New

1

York City Police Department, individually and in his official capacity; JOSEPH ESPOSITO, individually and in his official capacity; BRIAN CONROY, Deputy Chief of the New York City Police Department's Vice Enforcement Division, individually and in his official capacity; JESSICA STERLING, Detective, New York City Police Department, individually and in her official capacity; MICHAEL MADISON, Sergeant, New York City Police Department, individually and in his official capacity; MICHAEL MICHELINA, Detective, New York City Police Department, individually and in his official capacity; and SANDRA DAILEY, Detective, New York City Police Department, individually and in her official capacity,

*Defendants-Appellants*,

NEW YORK CITY UNDERCOVER POLICE OFFICERS JOHN DOES, individually and in their respective capacities; and SHARI C. HYMAN, Director of the New York City Mayor's Office of Special Enforcement,

*Defendants.*\*

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

**FOR APPELLANTS:** VICTORIA SCALZO, Assistant Corporation Counsel (Michael A. Cardozo, Corporation Counsel, *on the brief*; Stephen J. McGrath, Tonya Jenerette, and Celeste Koeleveld, *of counsel*), Corporation Counsel of the City of New York, New York, NY.

**FOR APPELLEE:** JAMES I. MEYERSON (Jeffrey A. Rothman, *of counsel*), New York, NY.

Appeal from a September 13, 2010 judgment entered in the United States District Court for the Southern District of New York (Shira A. Scheindlin, *Judge*).

**UPON CONSIDERATION WHEREOF, IT IS HEREBY ORDERED, ADJUDGED, AND DECREED** that the judgment of the District Court be **REVERSED** and the cause **REMANDED**.

Defendants-appellants (jointly, "defendants") bring this interlocutory appeal following entry

of an order in the United States District Court for the Southern District of New York denying their

---

\* The Clerk of Court is directed to amend the caption to read as shown above.

motion for summary judgment. The principal issue before us is whether defendants are entitled to qualified immunity from Robert Pinter's claims of false arrest, malicious prosecution, malicious abuse of process, discriminatory treatment, and denial of the right to free association.

## I.  Background[1]

On October 10, 2008, Pinter, a 52-year-old gay male, stopped at Blue Door to pick up a video. Blue Door sells both general entertainment and adult films. Upon arriving at Blue Door, Pinter headed for the separate adult section. While searching for a film, Pinter saw a younger man staring at him from the end of the aisle. Unbeknownst to Pinter, this younger male was an undercover police officer, known as "UC 31107." Pinter and UC 31107 made eye contact and smiled at one another. UC 31107 took a few steps towards Pinter, and Pinter reciprocated by doing the same.

UC 31107 then began flirting with Pinter by complimenting his looks and asking him "[W]hat do you like to do?" Pinter replied, "[O]h, thank you, you're good looking too," and then commented that he enjoyed—and was good at—oral sex. UC 31107 replied that he enjoyed oral sex as well, but was nervous about engaging in any such activity in the video store. UC 31107 then informed Pinter that his car was parked nearby—with the obvious implication that the car might be a suitable location for the two to engage in oral sex. Pinter led the way to the exit, with UC 31107 following right behind.

As the two men were about to leave the store, UC 31107 offered to pay Pinter $50 if he would allow UC 31107 to perform oral sex on him. Pinter did not say anything in response, although he claims that he then decided that "[a]ny possibility of really engaging in anything with [UC 31107] was over." Pinter admittedly failed to communicate his change of heart to UC 31107.

---

[1] The following facts, which are based on the First Amended Complaint and Pinter's deposition, are taken from the District Court's opinion. *See Pinter v. City of New York*, 710 F. Supp. 2d 408, 412-17 (S.D.N.Y. 2010).

Upon walking out of Blue Door together, UC 31107 motioned toward the east side of First Avenue and said "my car is parked over there." By apparent coincidence, the men's path took them toward both UC 31107's car and Pinter's apartment. While they walked they engaged in sexually suggestive flirtation. During the walk, Pinter felt free to walk away from UC 31107, but decided not to do so. Moreover, at no point did Pinter communicate to UC 31107 that he had decided not to have oral sex with him, whether or not money would be involved.

Shortly after the men emerged onto Sixth Street, two plain-clothes officers rushed towards Pinter and arrested him. Pinter was escorted to a police van, where an officer told Pinter that he had been arrested for prostitution. Pinter responded, "You've got to be kidding me. . . . [Y]our officer approached me, butted his nose into my business, and created this whole incident."

A few days after his arrest, Pinter pleaded guilty to the lesser charge of disorderly conduct, a non-criminal violation. In exchange for this plea, Pinter was sentenced to a conditional discharge, five counseling sessions, and a mandatory $120 fine.

A few months later, the New York City Police Department received complaints that it was targeting gay men for arrest on prostitution charges in order to help the City enforce nuisance abatement laws against providers of adult entertainment—particularly those focusing on gay clientele. Following these complaints, the Manhattan District Attorney's Office dismissed a number of prostitution prosecutions. On April 17, 2009, Pinter moved to vacate his conviction on the ground that it was obtained in violation of his rights to due process, fundamental fairness, and the effective assistance of counsel. The District Attorney's Office declined to oppose Pinter's motion to vacate, explaining:

> [I]t is unlikely that [Pinter] went to the location of the occurrence with the intent to solicit money for sex, as supported by his age (52 upon arrest), lack of a prior record for prostitution-related offenses, and overall law-abiding history. Furthermore, the People recently dismissed three pending cases with circumstances similar to those of the case at bar because the People concluded that it would be difficult to prove the guilt of the defendants in those cases beyond a reasonable doubt at trial.

4

The District Attorney's Office did, however, maintain that there had been probable cause for the arrest.

Later in 2009, Pinter commenced the instant action against the officers involved in his arrest, those officers' superiors, and other municipal personnel. Pinter raises a host of claims based on the federal and New York Constitutions.[2] Specifically, Pinter asserts that he was subjected to false arrest, malicious prosecution, and malicious abuse of the criminal process, discriminated against based on his sexual orientation, and denied his right to associate with Blue Door.[3] Pinter contends that these constitutional violations were proximately caused by a municipal "policy and practice of making probable cause lacking false arrests [sic] for the purpose of obtaining a data base of arrests which was to be utilized in independent nuisance abatement civil litigations instituted by the City of New York against certain targeted businesses, among them the Blue Door . . . ." Each of these claims is also brought against the City of New York (the "City") pursuant to *Monell v. Department of Social Services*, 436 U.S. 658 (1978).

The individual defendants moved for summary judgment on the false arrest, malicious prosecution, malicious abuse of process, discrimination, and interference with the right of association claims on the basis of the defendant-officers' qualified immunity. The City joined the motion, arguing that a single event (the arrest) could not give rise to municipal liability and that, in any event, should the underlying allegations of constitutional violations be dismissed, the *Monell* claims would likewise fail.

---

[2] Pinter's federal claims are brought pursuant to 42 U.S.C. § 1983.

[3] Pinter also brings claims of excessive force and unreasonable detention relating to the treatment he received during his initial arrest, regarding which the defendants apparently did not request summary judgment. Those claims are excluded from our analysis here.

Addressing the false arrest claim first, the District Court found that Pinter had alleged a violation of his clearly established constitutional right not to be arrested without probable cause. Thereafter, treating the remaining claims as derivative of the false arrest claim and deciding the motion solely on the issue of probable cause, the Court rejected the defendants' claims of qualified immunity on each claim and denied the motion for summary judgment.[4] This interlocutory appeal followed.

## II.    Discussion

"The denial of summary judgment is ordinarily an interlocutory decision, not a 'final decision' appealable under 28 U.S.C. § 1291." *Marshall v. Sullivan*, 105 F.3d 47, 53 (2d Cir. 1996). "When a court denies a motion for summary judgment based on a denial of qualified immunity, however, that determination is appealable under the collateral order doctrine when it is a legal conclusion made with reference only to undisputed facts." *Caldarola v. Calabrese*, 298 F.3d 156, 161 (2d Cir. 2002) (citing *Johnson v. Jones*, 515 U.S. 304, 313 (1995)). But when a denial of qualified immunity at the summary judgment stage is predicated on an underlying *factual* dispute, we lack jurisdiction to consider the matter under the collateral order doctrine. *Id.*; *see Behrens v. Pelletier*, 516 U.S. 299, 313 (1996). We can, however, review the District Court's legal conclusions *de novo* so long as we resolve all factual disputes identified by the court below in favor of the plaintiff. *See, e.g.*, *Caldarola*, 298 F.3d at 160-61.

*(1) – False Arrest*

The main issue defendants appear to raise on appeal is whether the District Court erred in denying defendants qualified immunity from Pinter's false arrest claim.

---

[4] The District Court granted absolute immunity to Shari Hyman, who directed the New York City Mayor's Office of Special Enforcement to commence a nuisance abatement action against Blue Door, because her actions were taken in a prosecutorial role. *Pinter*, 710 F. Supp. 2d at 411-12. Hyman's liability is not at issue in this appeal.

"Under federal law, a police officer is entitled to qualified immunity where '(1) his conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known, or (2) it was 'objectively reasonable' for him to believe that his actions were lawful at the time of the challenged act.'" *Jenkins v. City of New York*, 478 F.3d 76, 87 (2d Cir. 2007) (quoting *Cerrone v. Brown*, 246 F.3d 194, 199 (2d Cir. 2001)). "Ordinarily, determining whether official conduct was objectively reasonable 'require[s] examination of the information possessed' by the officials at that time (without consideration of subjective intent)." *Conn. ex rel. Blumenthal v. Crotty*, 346 F.3d 84, 106 (2d Cir. 2003) (quoting *Anderson v. Creighton*, 483 U.S. 635, 641 (1987)) (alteration in the original).

It is undisputed that probable cause "is a complete defense to an action for false arrest," *Weyant v. Okst*, 101 F.3d 845, 852 (2d Cir. 1996) (quotation marks omitted), and that the right to be free from arrest without probable cause was clearly established as of October 10, 2008. Pinter's false arrest claim thus turns on whether the defendant-officers acted with probable cause or, alternatively, whether their probable cause determination was at least objectively reasonable. "An officer's determination is objectively reasonable if there was 'arguable' probable cause at the time of arrest—that is, if 'officers of reasonable competence could disagree on whether the probable cause test was met.'" *Jenkins*, 478 F.3d at 87 (quoting *Lennon v. Miller*, 66 F.3d 416, 423-24 (2d Cir. 1995)). In considering whether defendants are entitled to qualified immunity in the instant case, we are mindful that the Supreme Court has observed that qualified immunity shields "all but the plainly incompetent or those who knowingly violate the law." *Malley v. Briggs*, 475 U.S. 335, 341 (1986)*; see Walczyk v. Rio*, 496 F.3d 139, 154 (2d Cir. 2007).

Pinter was arrested on a charge of prostitution. Under New York Penal Law § 230.00, "[a] person is guilty of prostitution when such person engages or agrees or offers to engage in sexual conduct with another person in return for a fee." Accordingly, we must ascertain whether, at the

7

very least, officers of reasonable competence could disagree as to whether Pinter's arrest for prostitution was supported by probable cause. "When determining whether probable cause exists [we] must consider those facts *available to the officer* at the time of the arrest and immediately before it, as probable cause does not require absolute certainty." *Panetta v. Crowley*, 460 F.3d 388, 395 (2d Cir. 2006) (quotation marks and citations omitted).

In denying the defendants qualified immunity, the District Court concluded:

> In sum, no competent officer could reasonably believe that it was probable that Pinter committed prostitution where the undercover knew that he (the officer): initiated the contact, steered the conversation toward sex, agreed to consensual gratuitous sex, took steps toward the location where the sex act was to occur, raised the issue of cash-for-sex, faced silence as to whether Pinter meant to accept the cash, continued walking toward the specified location, initiated further conversation about sex, and knew that Pinter was 52 years old. And there was no impediment to prevent the undercover from quickly pursuing a simple inquiry to ascertain additional information about whether Pinter had accepted or declined a fee offer.

*Pinter v. City of New York*, 710 F. Supp. 2d 408, 433 (S.D.N.Y. 2010). We respectfully disagree with the District Court's characterization of these events.

First, as to who initiated the contact and first steered the conversation towards sex, UC 31107's role—even in Pinter's account—was far less unilateral than the District Court's analysis suggests. The flirtation appeared to be mutual at the start, and while it was UC 31107 who began the conversation by complimenting Pinter's looks and asking Pinter what he liked to do, it was Pinter who first explicitly raised the topic of oral sex.

The District Court placed particular emphasis on the fact that Pinter and UC 31107 had apparently already agreed to engage in oral sex with one another *before* UC 31107 told Pinter that he wanted to pay him to receive oral sex as the two were leaving the store. As the District Court reasoned: "The existence of an agreement for sex gratis *immediately preceding* the offer of money fundamentally alters the facts available to UC 31107. UC 31107 knew he agreed to a free exchange

8

of oral sex when he first broached the idea of a monetary transaction." *Id.* at 428 (emphasis in the original).

We do not think the apparent existence of an "agreement for sex gratis" prior to UC 31107's offer of monetary compensation has nearly the impact that the District Court suggests. First, prior to UC 31107's offer, neither party had yet explicitly stated an interest in engaging in sexual activity with the other. Second, and of more significance, when UC 31107 offered Pinter the cash, both Pinter and the undercover officer had already expressed to each other a specific desire to *perform* oral sex. Following UC 31107's monetary offer and Pinter's seeming compliance, UC 31107 could have reasonably believed that Pinter had agreed to be compensated in exchange for allowing UC 31107 to act on his desire to perform oral sex on Pinter.

The District Court notes that, on the record before us, Pinter was silent as to whether he found UC 31107's offer appealing. However, the surrounding circumstances of the encounter, as known to UC 31107 at the time, present a more complicated picture. First, it was not plainly irrational or incompetent for UC 31107 to assume that Pinter visited the adult section of Blue Door in search of sexual gratification of one kind or another. Second, Pinter left the store with UC 31107 and without having purchased any adult videos. Third, as they left the store, Pinter accompanied UC 31107 on a walk towards UC 31107's car—the place where the sex act was to occur. At this point UC 31107 had no way of knowing that Pinter had privately decided not to pursue any sexual activity with UC 31107, and that he was merely headed in the same direction as UC 31107. Nothing in Pinter's behavior or conversation could reasonably lead UC 31107 to conclude, in the circumstances presented, that Pinter was not interested in receiving money for sexual activity. Finally, on their brief walk together following the mention of money for sex, the pair continued to flirt with one another—even if at UC 31107's instigation—and struck up an intimate sexual conversation. Putting all of these facts together, we do not think that it was unreasonable or

9

incompetent for UC 31107 to have assumed that Pinter intended to engage in oral sex with him in return for financial compensation.

It may be, as the District Court observed, that UC 31107's conduct left some additional care to be desired. *See Pinter*, 710 F. Supp. 2d at 429-30. In particular, UC 31107 could have been more explicit in ascertaining whether Pinter was truly relying on financial remuneration in return for allowing the undercover officer to perform oral sex on him. But qualified immunity analysis is not an inquiry into best practices or a reconstruction of events viewed in hindsight; the legal standard is much more generous to law enforcement officers. *See Malley*, 475 U.S. at 341. In view of the totality of the circumstances, even as seen in the light most favorable to Pinter, we hold that defendants acted reasonably—that is, not incompetently or in knowing violation of the law, *see id.*—in arresting Pinter for a violation of New York Penal Law § 230.00.[5] Accordingly, defendants are entitled to qualified immunity from Pinter's false arrest claim, and likewise from Pinter's malicious prosecution claim, which also turns on the existence of probable cause.[6]

As the District Court observed with regard to the remaining three claims—abuse of process, discrimination, and interference with the right to association—"defendants' sole argument is that, because there was probable cause for Pinter's arrest, each of the claims fail. Defendants have not meaningfully argued any other ground for dismissal of any of these [three] claims. Nor has Pinter meaningfully addressed them apart from the issue of probable cause." *Pinter*, 710 F. Supp. 2d at 434.

---

[5] We need not consider whether UC 31107's methods, which were undoubtedly aggressive, rose to the level of entrapment, because "[w]hile entrapment may be a proper defense in a criminal action, a police officer's participation in such activity does not constitute a constitutional violation." *DiBlasio v. City of New York*, 102 F.3d 654, 656-57 (2d Cir. 1996) (quotation marks omitted).

[6] As noted by defendants in their memorandum in support of their motion for summary judgment, a finding that there was probable cause to arrest also defeats Pinter's malicious prosecution claim. *See Savino v. City of New York*, 331 F.3d 63, 72 (2d Cir. 2003) ("[T]he existence of probable cause is a complete defense to a claim of malicious prosecution in New York."). Therefore, although the issue was not directly before us on appeal, our finding that the officers had arguable probable cause to arrest Pinter necessarily entitles the defendants to qualified immunity on his malicious prosecution claim as well.

The District Court properly declined to "create arguments in favor of or against dismissal of these claims," *id.*, and therefore denied qualified immunity on those claims as an extension of her ruling on the false arrest claim. However, the District Court noted, "[a]t the close of discovery, the parties will be permitted to move for summary judgment on any of Pinter's claims. In so doing, defendants may raise any ground in support of such motion with respect to the . . . malicious abuse of process, discrimination, and associational claims." *Id.*

On appeal defendants continue to rely solely on the alleged presence of arguable probable cause, but do not meaningfully address the effect that such a finding would have upon the abuse of process, discrimination, or associational claims. Therefore, we decline to speculate what effect our holding today will have on those claims and their associated *Monell* claims, and instead remand them for further consideration by the District Court.

*(2) – The Liability of the City of New York*

Pinter's *Monell* claims are derivative of his claims against the individual defendants, and therefore any claims dismissed as against the individual defendants must also be dismissed as against the City. *See City of Los Angeles v. Heller*, 475 U.S. 796, 799 (1986) ("[I]f [the police officer] inflicted no constitutional injury on respondent, it is inconceivable that [the city] could be liable to respondent."); *Escalera v. Lunn*, 361 F.3d 737, 748-49 (2d Cir. 2004). Accordingly, although not before us on appeal, the *Monell* claims based on Pinter's allegations of false arrest and malicious prosecution must fail.

**CONCLUSION**

The judgment of the District Court denying defendants qualified immunity from Pinter's false arrest and malicious prosecution claims is **REVERSED**. On remand, after such further discovery as may be appropriately conducted with regard to the remaining claims, the District Court will consider any further motions from the defendants claiming entitlement to qualified immunity or judgment on the merits of the abuse of process, discrimination, associational, excessive force, and unreasonable

11

detention claims, as well as the liability of the City of New York on any remaining *Monell* claims stemming from the surviving individual claims. The District Court shall not permit the plaintiff to pursue *Monell* claims derived from either the false arrest or malicious prosecution claims. The cause is **REMANDED** to the District Court for further proceedings consistent with this order.

FOR THE COURT,

Catherine O'Hagan Wolfe, Clerk of Court